582 So.2d 1320 (1991)
STATE of Louisiana
v.
Gerald BAKER.
No. 90-KA-0558.
Court of Appeal of Louisiana, Fourth Circuit.
May 30, 1991.
Rehearing Denied August 27, 1991.
*1322 Harry F. Connick, Dist. Atty., David L. Arena, Lisa McLachlan, Asst. Dist. Attys., New Orleans, for appellee.
Leroy A. Hartley, Robert F. Fleming, Jr., Craig Colwart, New Orleans, for appellant.
Before KLEES, LOBRANO and WARD, JJ.
LOBRANO, Judge.
Defendant, Gerald Bernard "Ben" Baker, Sr., was indicted by a grand jury for the November 2, 1988 first degree murder of Michael Alden, Jr., a violation of La.R.S. 14:30.
Defendant was arraigned on December 12, 1988 and pled not guilty. Trial was held August 22nd thru 25th, 1989. Defendant *1323 was found guilty as charged by a twelve member jury. Following the sentencing phase of the trial, the jury recommended that defendant be sentenced to life imprisonment.
On November 30, 1989, the trial court denied defendant's motion for a new trial. Defendant waived all delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

FACTS:
On November 2, 1988, at approximately 9:15 a.m. defendant arrived at the home of Rhoda and Michael Alden, Sr. located at 7711 Redfish Street in New Orleans, Louisiana. The purpose of his visit was to look through some old books that Mrs. Alden was going to give to the public library and to bring her a weight loss tape. Defendant, who was knowledgeable in hypnosis, had been helping Mrs. Alden attempt to lose weight through hypnotic suggestion. Mrs. Alden and her husband had known defendant for fourteen years mostly through business dealings.
At trial, Mrs. Alden testified that defendant had made the appointment for 10:00 a.m. When defendant arrived early she was not ready to receive him and asked him to wait outside. After making herself more presentable, Mrs. Alden turned off the burglar alarm system and let defendant in the house. Defendant was wearing a floppy navy blue hat, light blue shirt, navy blue pants, blue sweater, navy blue trench coat and was carrying a brief case. Also present in the home was the victim, Michael Alden, Jr. who was in his bedroom. Mrs. Alden stated her son worked at night as a security guard at the Windsor Court Hotel and often slept late. She testified that she knew he was in his room that morning with the family's two dogs and couldn't say whether he was sleeping, listening to music or watching television as he often used headphones.
Mrs. Alden stated that once she let defendant inside, she re-set the alarm system. She testified that the house was equipped with a sophisticated alarm system to protect the valuable art which her husband sold through his art business. She stated she routinely kept the system armed and used by-pass switches to go in and out.
Mrs. Alden stated that once inside the house, the defendant began to act very strange. She stated he took off his coat and neatly folded it. Then he took off his hat and placed it on the table. He then requested a cup of "International Coffee", a brand which he always professed not to like. Then he took off his sweater and threw it. She stated this was very uncharacteristic of him because he was a very neat person. In addition, she testified that he requested that she not answer the phone but rather turn on the answering machine. She stated she refused not to answer the phone because of her husband's business.
Defendant and Mrs. Alden then proceeded to drink coffee and engage in general conversation during which defendant stated that he was considering buying a gift for his wife and asked to see several pieces of jewelry Mrs. Alden had for sale. Mrs. Alden operated a jewelry business from her home and kept the jewelry in a safe in an office in the rear of the house. At defendant's request, Mrs. Alden removed the jewelry from the safe and showed it to defendant. After viewing the jewelry for several minutes, defendant decided not to buy it. Mrs. Alden then placed the jewelry back in the safe. General conversation then resumed. After a short period of time, defendant asked to see one of the pieces again, a gold and diamond necklace. Again, Mrs. Alden removed the necklace and showed it to defendant. Again defendant decided not to buy it and Mrs. Alden placed it back in the safe. Defendant asked to see the necklace several more times only to change his mind about purchasing it. Mrs. Alden testified that defendant's indecision was becoming an annoyance. She requested that he take the necklace on loan and show it to his wife. If he decided to keep it he could pay her later. Defendant declined the offer.
All the while that defendant kept asking to see the jewelry, Mrs. Alden kept directing his attention to the boxes of books. She requested several times that he look *1324 through the boxes and pick which books he wanted. She even suggested that if he needed help carrying the books that she would call her son Michael to help him. Defendant declined the offer. Instead, he asked again to see the gold and diamond necklace. As Mrs. Alden was removing the necklace from the safe, she was struck on the head. Believing that something had fallen from above the safe, she cried out to defendant to help her. As she turned around, she saw defendant standing behind her. He had a "horrible grimace on his face". He then shot her three times. Realizing what had happened, Mrs. Alden lay still on the floor pretending to be dead. She then heard a struggle accompanied by a succession of screams and a gurgling sound. Eventually she was able to get up, turn off the alarm using a by-pass switch and exit through a side door. She ran across the car port to the home of her next door neighbor, Andy Williams at 7713 Redfish Street. Mr. Williams lived there with his parents. Mrs. Alden told Williams and his mother that defendant shot her and that Michael was still in the house.
Williams then placed a call to 911. He told the dispatcher that Mrs. Alden had been shot. He then went over to the Alden home and looked inside but was unable to see anyone. Shortly thereafter, the police arrived. They spoke to Mrs. Alden and then drove her to the hospital. Because of the possibility that Michael Alden was being held hostage, several police officers took up positions around the house.
Officer Tommy Silbernagel was watching the rear of the residence. He observed a white, heavy set male wearing dark pants and a light blue shirt walk past the sliding glass door in the direction of the laundry room. Several minutes later he saw a differently dressed heavy set white male wearing dark pants, a dark jacket or sweater and a dark hat walk past the sliding glass door in the opposite direction. Silbernagel observed this activity several more times. At no time did Silbernagel observe two individuals walk past the door together. Silbernagel testified that at first he thought he was seeing two people but after watching for a while, he realized he was seeing the same person attempting to disguise himself to look like two people.
After approximately thirty minutes of surveillance, defendant exited the front door of the Alden house. He was wearing a light blue shirt with blood stains and dark navy blue pants. Defendant was frisked for weapons and placed in a police car. Sergeant Wilbain Porter and Officer Silbernagel entered the house. They found the body of Michael Alden, Jr. on the floor of the den. He had sustained two gunshot wounds and several stab wounds. A wire coathanger was wrapped around his throat and mouth. It was learned later that before he died, the victim had placed a 911 call for help. He did not identify his killer.
The police searched the house. Two kitchen knives were seized as the possible murder weapons. The following day, Detective Jackleen Davis found a .22 caliber revolver, belonging to defendant, shoved between boxes on a bookshelf in the victim's bedroom.
Defendant's car, which was parked outside the house, was searched. Inside the trunk was found defendant's Louisiana license plate and numerous U.S. postal mailbags. An Ohio license plate was on the car. A warning sticker was placed over the brake tag and a piece of black electrical tape covered the dealership nameplate.
Defendant was transported to the homicide office where he was given his Miranda rights. Defendant refused to give a statement to police. However, as Detective Davis began to complete the field arrest report, defendant began to speak. He stated that when he answered the door, two black men rushed past him. An altercation ensued during which he was knocked unconscious. He later awoke to find the victim lying wounded on the den floor.
Defendant's clothes were tested for the presence of gunpowder. None was found. No gunpowder tests were done on defendant's hands.
The autopsy revealed the victim sustained two gunshot wounds and five stab wounds. Dr. Thomas Gilchrist, who performed the autopsy, testified the victim *1325 died from the gunshot wounds with the stab wounds a contributing factor. The coathanger did not contribute to the victim's death.
Ballistics tests showed the bullets recovered from the victim were fired from defendant's gun which was found at the scene. Two human hairs were found in the victim's hand. These were tested by the F.B.I. crime lab. Neither hair was from defendant. One was a light caucasian hair and one was a negroid limb hair fragment.
The defense presented several expert witnesses.
Dr. George McCormick, a pathologist, testified that the blood stains on defendant's shirt were not consistent with the victim's stab wounds.
Dr. Al Yonovitz, an expert in speech and hearing analysis, analyzed the 911 calls made by Williams and the victim and the police broadcast tape. Dr. Yonovitz testified that an enhanced analysis of the victim's 911 call revealed the presence of a male voice in the background that was neither the victim's nor the dispatcher's. In addition he concluded that there was another male voice in the background which said, "Just kill him and let's get out of here." The victim's 911 call and the police broadcast tape were played for the jury.
James Parrie and his mother, Maria Parrie testified for defendant. Both stated they knew the Aldens and defendant for many years. They stated that they went to see Mrs. Alden at Methodist Hospital. They testified that she stated that she could not believe defendant shot her but that he must have done it because the police said he did. They further testified that Mrs. Alden described her assailant as having a distorted face and long flowing hair.
Javier Banos, defendant's financial advisor, testified that at the time of the murder, defendant had approximately $200,000.00 in mutual funds and was in good financial shape.
Dr. Charles Moan, a psychologist, conducted a psychological evaluation of defendant. He testified that in his opinion there was a very low probability that defendant committed the murder because of his personality which he described as a "fussy old man".
Defendant testified in his own behalf. He stated he arrived at the Alden's home at 9:15 a.m. to give Mrs. Alden a new hypnosis tape and to look through some old books. He stated that he and Mrs. Alden talked about various subjects during which she tried to get him to buy a gold necklace for his wife. He stated he told her that he was not interested in buying it. He stated that throughout their conversation, Mrs. Alden received several telephone calls. During the one call, he let the Alden's two dogs into the house through a back door. He testified the alarm did not sound when he let the dogs in. He stated that around noon, Mrs. Alden received another telephone call. She went into the back office to answer the call. Defendant testified he remained seated in a chair in the den petting the dogs. He then stated he sensed the presence of someone in the room whom he believed to be Mrs. Alden. When he looked up, he saw a dark complexioned man. He was then struck on the head and knocked to the floor. He testified that he reached for his gun which he carried in his brief case. The assailant took the gun from him and knocked him unconscious. When he regained consciousness, he got up and began to do down the hall at which time he confronted the assailant who was dragging Michael Alden by the hair. When the assailant saw defendant, he let Michael go then kicked defendant in the groin causing him once again to lose consciousness. When he regained consciousness, he found the victim lying on the floor in the den. Defendant testified he attempted to lift the victim in an effort to help him but he was too heavy. He stated that he then exited the house where he was grabbed by the police and placed in a police car.
Defendant stated he put the Ohio license plate on his car so he could play a practical joke on Mrs. Alden who always said Yankees were better horse traders than southerners. He was going to take her outside and show her that he had become a "Yankee *1326 trader". He testified he found the Ohio plate in the parking lot of Home Depot. Defendant testified the sticker he placed over his brake tag was placed there to discourage car thieves. He stated that these stickers were used in a business he once owned in which he video taped home and business inventory to protect against theft. He stated the electrical tape over the dealership nameplate must have been left there by the body shop that worked on the car a few weeks before. He testified that the mailbags were used in a mail order picture frame business he partially owned.
Defendant appeals his conviction and sentence asserting the following assignments of error:
1) The trial court erred in denying the subpoena duces tecum for Rhoda Alden's psychological records.
2) The trial court erred in denying the motion to suppress defendant's statements.
3) The trial court erred in denying a request for the complete investigatory report.
4) The trial court erred in denying the release of exculpatory evidence contained in the full police report.
5) The trial court erred in admitting the hearsay testimony of Andy Williams.
6) The trial court erred in allowing the jury to view the affidavit for the search warrant.
7) The trial court erred in playing the entire tape of a police call.
8) The State failed to present sufficient evidence to sustain defendant's conviction.
9) The trial court erred in denying the Motion for a New Trial.
10) The trial court erred in not allowing the defense to call a juror to testify in the Motion for a New Trial.
11) The defendant is deprived of his constitutional right to appeal due to an incomplete transcript.
12) The trial court erred in allowing the State to present hearsay testimony of Mrs. Alden's prior consistent testimony without laying a proper foundation and in allowing the jury to hear this hearsay testimony without a limiting instruction.
During oral argument, defendant raised the issue of an improper "Cage" jury charge[1] having been given.

ASSIGNMENT OF ERROR 1:
Defendant asserts the trial court erred in refusing to grant a subpoena duces tecum for the names of any and all psychiatrists and psychologists who had treated Mrs. Alden and all records pertaining to that treatment. Defendant argues the trial court should have allowed him to obtain this information in order to impeach Mrs. Alden's credibility as his investigation revealed a tendency on her part to lie and fabricate stories. In support of this contention, defendant cites Louisiana Code of Evidence Article 607 which allows any party to attack the credibility of a witness.
Following a hearing on the subpoena duces tecum, the trial court ruled that Mrs. Alden's psychiatric records were privileged and not discoverable. We agree.
La.R.S. 15:476(A) provides in pertinent part:
"A. Except as provided in Subsection B, no physician is permitted, whether during or after the termination of his employment as such, unless with his patient's express consent, to disclose any communication made to him as such physician by or on behalf of his patient, or the result of any investigation made into the patient's physical or mental condition, or any opinion based upon such investigation, or any information that he may have gotten by reason of his being such physician. The provisions of this Section shall not apply to any physician, who, under the appointment of the court, and not by a selection of the patient, has made investigation into the patient's physical or mental condition; in addition, any physician may be cross-examined upon the correctness of any certificate issued by him."
La.R.S. 37:2363(A) provides in pertinent part:

*1327 "A. In judicial proceedings, whether civil, criminal, or juvenile, legislative and administrative proceedings, and proceedings preliminary and ancillary thereto, a patient or client, or his legal representative, may refuse to disclose or prevent the disclosure of confidential information, including information contained in administrative records, communicated to a psychologist licensed under this Chapter, or persons reasonably believed by the patient or client to be licensed, or to their employees or other persons under their supervision, for the purpose of diagnosis, evaluation, or treatment of any mental or emotional condition or disorder."[2]
Defendant is correct in his assertion that Louisiana Code of Evidence Article 607 allows a witnesses' credibility to be attacked. However, Article 607 is a broad and general authority and does not regulate with specificity the nature of the evidence admissible to carry out such an attack. Other articles of the Code of Evidence detail what evidence is admissible to attack or support a witnesses' propensity or lack thereof for truthfulness.[3]
Article 608 specifically provides:
"A. Reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:
(1) The evidence may refer only to character for truthfulness or untruthfulness.
(2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
(3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
B. Particular acts, vices, or courses of conduct. Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required." (Emphasis added)
Official comment (a) to Article 608 states:
"(a) This Article is generally based on Federal Rule of Evidence 608(a) and effects a change in Louisiana law. Under Paragraph A of this Article reputation evidence concerning a witness' truthfulness or untruthfulness is the only form of character evidence admissible on the issue of credibility. Testimony as to bad or good general moral character, which formerly was admissible under R.S. 15:490, is no longer admissible to attack or to support the credibility of a witness." (emphasis added).
Thus, the trial court did not err in refusing to issue the subpoena duces tecum for Mrs. Alden's psychiatric and/or psychological records. Those records were privileged and not discoverable pursuant to La. R.S. 15:476 and La.R.S. 37:2363 and inadmissible pursuant to La.C.E. Article 608 because they did not constitute evidence of her general reputation for truthfulness. See also, State v. Burrell, 561 So.2d 692 (La.1990), cert. den. ___ U.S. ___, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Davis, 562 So.2d 1173 (La.App. 4th Cir. 1990); State v. Eishtadt, 531 So.2d 1133 (La.App. 4th Cir. 1988).

ASSIGNMENT OF ERROR 2:
Defendant asserts the trial court erred in refusing to suppress statements made by him to Detective Jackleen Davis after defendant invoked his Fifth amendment right to silence and to have his attorney present. Defendant argues there was no voluntary waiver of his constitutional rights prior to the statements. He asserts he was prejudiced when the state used these statements to impeach his trial testimony as to the events that led to the murder of Michael Alden, Jr.
*1328 At the Motion to Suppress hearing, Detective Davis testified that she advised defendant of his Miranda rights at the homicide office prior to preparing the field arrest report. She stated that defendant indicated that he did not wish to make a statement. No interrogation followed. Detective Davis then asked defendant his full name, address and date of birth in order to complete the field arrest report. Defendant provided the information. As Detective Davis began to complete the report, defendant began to talk or, as Detective Davis described it, "babble". Defendant was very upset. He stated that he did not understand why he was being charged with murder. He told Detective Davis that when Mrs. Alden was in the rear office, he answered a knock at the front door. Two black men rushed in. An altercation ensued and he was knocked unconscious. When he awoke, he stated he found the victim in the den with various wounds. Detective Davis stated that she then asked defendant a question as to the statements and defendant stated he did not wish to continue talking and that he wanted his attorney. Detective Davis then completed the field arrest report. On cross examination, Detective Davis stated she did not re-advise defendant of his constitutional rights once he began to speak, did not interrupt him while he talked and did not write down or otherwise record his statements.
The statements made by defendant to Detective Davis were clearly exculpatory in nature. Here, the prosecution used these statements, not as a confession, but to impeach defendant's trial testimony as to what happened the day of the murder. This same issue was addressed in State v. Malveaux, 499 So.2d 301 (La.App. 1st Cir. 1986), writ den., 505 So.2d 1138 (La.1987). In Malveaux, as in the instant case, the State used exculpatory statements made by the defendant in conjunction with contradictory evidence in order to prove defendant's guilt. The defendant argued the statements were inadmissible. In affirming the trial court's ruling allowing the statements in evidence, the appellate court stated:
"In State v. Andrus, 250 La. 765, 199 So.2d 867 (1967), the court noted that incriminating statements made by the accused are placed in three categories. The first is the confession which admits to the guilt of the crime charged. The second is the admission which involves the existence of criminal intent. The third is the admission or acknowledgment of facts which tend to establish guilt but which do not involve the existence of criminal intent. Id. at 765, 199 So.2d at 880. The court concluded that remarks which are not express admissions of guilt or facts showing criminal intent can be introduced without the foundation necessary for admitting a confession, despite the fact that the statement might be considered inculpatory. Id. at 765, 199 So.2d at 881.
Of course, truly exculpatory statements are never used by the prosecution. Statements which the defendant intended to be exculpatory are instead used to impeach his testimony at trial or to demonstrate inaccuracies in the statement he gave under interrogation and thus to prove guilt by implication. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In Miranda, the Court demanded that the advice-of-rights warning be given regardless of whether the statements are considered inculpatory or exculpatory.
In the instant case, defendant's statements are exculpatory and do not purport to be confessions under LSA-R.S. 15:451. They do not involve the existence of criminal intent. The state offered these statements in conjunction with other contradictory statements and evidence for the obvious purpose of showing guilt by implication. Therefore, the state was required only to show that defendant had been advised of his constitutional rights and waived the same before making his statements." Id., 499 So.2d at pps. 304 and 305. (emphasis added)
Once a defendant invokes his constitutional right to silence, the validity of any subsequent waiver depends upon the *1329 "scrupulous honoring" of the right by the police. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); State v. Brooks, 505 So.2d 714 (La.1987), cert. den., 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Whether defendant's right to silence has been "scrupulously honored" depends upon the totality of the circumstances, including who initiated the further questioning; the time delay between the original request and subsequent questioning; whether Miranda warnings were given before each interrogation; whether a waiver of rights form was signed; and whether the police exerted pressure on the defendant between the time he invoked his right to silence and the subsequent interrogation. State v. Brooks, supra.
The statements made by defendant to Detective Davis were clearly exculpatory, spontaneous, voluntary and not the result of an interrogation or other compelling influences. Defendant neither admitted to the murder nor did he make any statements which revealed any criminal intent or admission of guilt. Given the totality of the circumstances, we find that Detective Davis "scrupulously honored" defendant's right to remain silent. She testified unequivocally that she read defendant his constitutional rights prior to him making any statements. He answered that he understood his rights and did not wish to speak. Detective Davis did not ask defendant any questions about the murder. Moments later, defendant voluntarily made the statements in question. Detective Davis did not interrogate or question defendant as he spoke or encourage him in any manner. Thus, we find that defendant voluntarily waived his right to remain silent when he made the exculpatory statements.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR 3 AND 4:
Defendant asserts the trial court erred first, by refusing to allow discovery of the full police investigative report instead of just the five page incident report prepared by Detective Bryon Adams and second, by denying him discovery of Brady material contained in the police investigative report.

THE POLICE REPORT:
La.R.S. 44:3(A)(1) and (4)(a) provides in pertinent part:
"A. Nothing in this Chapter shall be construed to require disclosures of records, or the information contained therein, held by the offices of the attorney general, district attorneys, sheriffs, police departments, Department of Public Safety, marshals, investigators, correctional agencies, or intelligence agencies of the state, which records are:
(1) Records pertaining to pending criminal litigation or any criminal litigation which can be reasonably anticipated, until such litigation has been finally adjudicated or otherwise settled: or
* * * * * *
(4)(a) The records of the arrest of a person, other than the report of the officer or officers investigating a complaint, until a final judgment of conviction or the acceptance of a plea of guilty by a court of competent jurisdiction. However, the initial report of the officer or officers investigating a complaint, but not to apply to any follow up or subsequent report or investigation, records of the booking of a person as provided in Louisiana Code of Criminal Procedure Article 228, records of the issuance of a summons or citation, and records of the filing of a bill of information shall be a public record." (emphasis added).
The above statute declares as a public record the entire initial report of the officer or officers investigating a complaint. Any subsequent report, however, which concerns an investigation by police beyond investigating the complaint is not public record. State v. Burnes, 516 So.2d 375 (La.App. 4th Cir.1987). Nevertheless, the reporting officer or officers may not defeat the purpose of the statute by including only selected information in the initial report and placing the remainder in a subsequent supplemental report. State v. McEwen, 504 So.2d 817 (La.1987).
*1330 The investigative report complained of is not the initial police report of the complaint. Nothing in the record indicates that Detective Adams recorded only selected information in his initial report while recording the rest in a subsequent report so as to defeat the mandate of La.R.S. 44:3(A).
We find no error in the trial court's refusal to allow discovery of the entire police investigative report.

BRADY MATERIAL:
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." See also, C.Cr. Pro. Art. 718.
Evidence is material, and hence discoverable, if there is a "reasonable probability" that the outcome of the trial would have been different had the evidence been disclosed to the defense. U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
The undisclosed information must be evaluated in the context of the entire record; and if there is no reasonable doubt about defendant's guilt, irrespective of this evidence, there is no justification for a new trial. State v. Paul, 499 So.2d 1288 (La. App. 4th Cir.1986), writ den., 503 So.2d 475 (La.1987).
Defendant asserts there is exculpatory evidence in the police investigative report that is material and should have been disclosed prior to trial.[4] Defendant argues that this evidence is material in that it creates a reasonable doubt which does not otherwise exist and which corroborates his version of the facts. He asserts that by denying him access to this evidence, the trial court deprived him of a fair trial. We disagree.
Defendant's assertions and arguments are speculation and supposition. The trial court conducted an in camera inspection of the full police investigative report and determined that it contained no Brady material. We have also reviewed the entire report and find no error in the trial court's ruling. Even if the report had been disclosed to defendant prior to trial, it does not constitute "material" evidence because, considering the information contained therein in the context of the entire record, it is highly doubtful that it would have created such a reasonable doubt so as to change the jury's verdict.
These assignments of error are without merit.

ASSIGNMENT OF ERROR 5:
Defendant asserts the trial court erred in admitting the testimony of Andy Williams to the effect that Mrs. Alden told him defendant shot her. Defendant argues that this statement does not fall within the excited utterance exception to the hearsay rule for two reasons. First, the amount of time which elapsed between the shooting of Mrs. Alden and her statement to Williams was not established. Second, Mrs. Alden's actions after being shot are indicative of reflective thought in that she lay on the floor feigning her death and contemplating what she should do to save herself. We disagree.
*1331 First, we are of the opinion Alden's statement to Williams is not hearsay. Louisiana Code of Evidence Article 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." The article further provides that a statement is not hearsay if the declarant (Mrs. Alden) testifies at trial and is subject to cross-examination and the statement offered is "one of identification of a person made after perceiving him, and which confirms the testimony of the declarant that he made an identification...." La.C.E. Art. 801(D)(1)(c).
Alden's statement to Williams identifies defendant after she perceived him. She testified and was subject to cross-examination. According to the plain wording of Article 801(D)(1)(c) her statement is not hearsay.
However, assuming arguendo the statement is hearsay, we also conclude it falls within the "excited utterance" exception. Louisiana Code of Evidence Article 803(2) defines the excited utterance exception to the hearsay rule as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[5]
This exception requires an occurrence or event sufficiently startling to render the declarant's normal reflective thought processes inoperative. State v. Reaves, 569 So.2d 650 (La.App. 2nd Cir. 1990), writ den., 576 So.2d 25 (La.1991). Furthermore, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought. State v. Henderson, 362 So.2d 1358 (La. 1978).
In determining whether the declarant was under stress of an excited event, the time span between the event and the statement is considered the most important factor. State v. Reaves, supra. The trial court must determine whether the interval between the event and the statement was of sufficient duration to permit a subsidence of emotional upset and a restoration of a reflective thought process. State v. Henderson, supra.
Other factors which may indicate that a statement was the result of reflective thought, but which do not automatically justify exclusion, are: (1) evidence that the statement was self serving or made in response to an inquiry; expansion of the excited utterance beyond a description of the event and into past or future facts; and proof that, between the event and the statement, the declarant performed tasks requiring reflective thought processes. State v. Henderson, supra.
Being struck on the head and shot three times are certainly startling or exciting events sufficient enough to render Mrs. Alden's reflective thought process inoperative. The record reflects that a relatively short period of time passed between the shooting and the statement. Mrs. Alden testified that she telephoned Judith Held at Symmetry Jewelers at approximately 11:50 a.m. Following this call, Mrs. Alden stated she and defendant conversed for several minutes before she was shot. This would establish the probable time of the shooting to be sometime past noon. Williams called 911 at 12:37 p.m., after Mrs. Alden entered his home and told him what had happened. Thus, it appears that probably less than thirty minutes elapsed between the time she was shot and her statement to Williams that defendant shot her.
*1332 While the record indicates that Mrs. Alden had enough presence of mind to feign her death and contemplate the best course of action to save herself, she was still under the influence of an excited event. Mrs. Alden testified she was within inches of defendant when he shot her. As she lay on the floor she was terrified of bleeding to death and of defendant returning to kill her. Furthermore, she heard the altercation between defendant and her son and heard her son's screams. Thus, we find the record fully supports the conclusion that Mrs. Alden's reflective processes were rendered inoperative and that her statement was a spontaneous reaction to a "startling event".
This assignment of error is without merit.

ASSIGNMENT OF ERROR 6:
Defendant asserts that the trial court erred in admitting into evidence the search warrant for defendant's shoes. Defendant argues the warrant contains inadmissible hearsay.
A review of the record shows the warrant was not placed in evidence nor was it shown to the jury. It was merely filed in the record of these proceedings.
There is no prejudice, and thus no merit to this assignment.

ASSIGNMENT OF ERROR 7:
Defendant asserts the trial court erred in allowing a double hearsay statement into evidence thus denying him a fair trial.
At trial, defendant called Dr. Al Yonovitz, an expert in speech and hearing science. At defendant's request, Dr. Yonovitz had prepared videotapes and written transcripts of Andy Williams' 911 call, the victim's 911 call and the police broadcast tape of the events surrounding the police response to the initial complaint. During direct examination, defendant introduced a portion of the broadcast tape that corroborated Officer Silbernagel's testimony that he radioed to fellow officers that he saw two different people in the Alden residence. This portion of the tape was played for the jury. On cross-examination, however, the State sought to introduce another portion of the tape containing an unrelated statement by another police officer, to wit, "all right, the nurse tells me that the perpetrator is Ben Baker". Defendant objected to the statement as hearsay. The trial court overruled the objection and allowed the entire portion, including the complained of statement, to be played before the jury.
Evidence of an out-of-court statement offered to prove the truth of the statement is hearsay and inadmissible. La.C.E. Art. 802; State v. Joseph, 425 So.2d 1261 (La. 1983).
Hearsay evidence rests its value upon the credibility of the out-of-court asserter. State v. Martin, 356 So.2d 1370 (La. 1978).
The primary justification for the exclusion of hearsay is that the adversary has no opportunity to cross-examine the absent declarant to test the accuracy and completeness of the testimony. State v. Wille, 559 So.2d 1321 (La.1990).
The evidence in question is clearly hearsay and does not fall under any of the hearsay exceptions set forth in La.C.E. Arts. 803 and 804. Nevertheless, we find that the erroneous admission of that statement does not require reversal of defendant's conviction because the error is harmless. Reversal is mandated only when there is a possibility that the evidence might have contributed to the verdict. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
Mrs. Alden, the declarant, testified that defendant shot her. She was subject to cross-examination. Thus, even though she made the same statement to the nurse, who in turn told the police, she was subject to defendant's scrutiny of that statement. The veracity of the declarant's statement did not go unchecked.
Although defendant argues this statement had a prejudicial "cumulative" effect on the jury, we disagree. Defendant attacked the credibility of Mrs. Alden's statements during cross-examination and through the testimony of other witnesses. The jury heard all of this evidence and was free to believe or disbelieve Mrs. Alden. In *1333 light of all the evidence attacking her credibility, we find no prejudice in the erroneous admission of this hearsay statement.
This assignment of error is without merit.
ASSIGNMENT OF ERROR 8:
Defendant asserts there was insufficient evidence to support his conviction. Specifically, defendant argues that the State failed to prove that he murdered Michael Alden, Jr. because no direct evidence was presented that he shot and stabbed the victim and the circumstantial evidence was insufficient to exclude every reasonable hypothesis of innocence.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Fuller, 414 So.2d 306 (La.1982).
Nevertheless, the reviewing court may not disregard its duty to consider whether the evidence is constitutionally sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988).
When the conviction is based on circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. La.R.S. 15:438; State v. Camp, 446 So.2d 1207 (La. 1984). This is not a stricter standard of review, but rather an evidentiary guide for the jury when it considers circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La. 1985). If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails. Unless another hypothesis creates reasonable doubt, the defendant is guilty. State v. Captville, 448 So.2d 676 (La. 1984).
Defendant was convicted of the first degree murder of Michael Alden, Jr. committed during the perpetration or attempted perpetration of armed robbery. Defendant asserts that no rational trier of fact could have concluded that he was the murderer because the circumstantial evidence presented by the State did not exclude every reasonable hypothesis of innocence, specifically, that someone else committed the murder. We disagree.
The elements of the offense are:
(1) the killing of a human being;
(2) when the offender has the specific intent to kill or to inflict great bodily harm;
(3) and is engaged in the perpetration or attempted perpetration of armed robbery. La.R.S. 14:30.
Mrs. Alden testified that she operated a jewelry business from her home. Defendant came to her home on November 2, 1988 to pick up some old books. Mrs. Alden turned the burglar alarm off, let defendant in, and then reset the alarm. Defendant requested that Mrs. Alden not answer the telephone. A request which she refused. During the course of their conversation, defendant asked to see certain items of jewelry that Mrs. Alden kept locked in a vault. After allowing defendant to see the jewelry, Mrs. Alden returned it to the vault. Unable to decide if he wanted a particular gold and diamond necklace, defendant asked to see it several more times. Each time, Mrs. Alden removed the necklace from the vault, showed it to defendant and returned it to the vault. Finally, defendant told Mrs. Alden he wanted to buy the necklace. As she removed it from the vault, she was struck on the head. As she turned she saw defendant standing behind her. He then shot her three times. Mrs. Alden stated:
"I stayed for a while, and I wanted to make sure I didn't hear any shuffling around. And he kind of kicked me on the way out. And I heard a door or a drawer opening and then I heard somebody either coming in or out of the room. And it sounded like the noise was coming toward me. And I said, `Thank God. Michael is going to come and save me.' Then all of a sudden I heard young Mike yell, `Who? What?' And there was a pause, and then there was a plunge. And I heard this horrible scream. And *1334 then there was quiet. And then there was another plunge. And then there was another horrible scream."
Defendant testified that when Mrs. Alden went to answer the telephone, he was struck from behind. As he reached for his gun, the assailant took it from him and knocked him unconscious. When he awoke he saw the assailant dragging the victim by the hair. The assailant let the victim go and kicked defendant in the groin knocking him unconscious. When he awoke, he found the victim laying on the floor. He attempted to pick the victim up but he was too heavy. He then exited the front door and was arrested.
Clearly, the jury believed Mrs. Alden's testimony and not that of defendant. Defendant's version of what happened is simply not credible. None of the police officers who surrounded the house saw anyone other than defendant exit the house. Moreover, it is difficult to believe that the alleged assailant would so viciously attack Mrs. Alden and her son but leave defendant relatively unharmed. Furthermore, defendant's explanation of why he changed the license plate on his car and covered the brake tag is difficult to believe.
Thus considering the evidence in the light most favorable to the prosecution to the exclusion of every reasonable hypothesis of innocence, a rational trier of fact could have found defendant guilty beyond a reasonable doubt.
This assignment of error is without merit.

ASSIGNMENTS OF ERROR 9 AND 10:
Defendant asserts the trial court erred in denying his motion for a new trial based upon allegations of jury tampering and in not allowing him to call jurors as witnesses in support of his motion.
On the third day of trial, the jurors were returned by sheriff's deputies to the Quality Inn where they were sequestered. Defendant contends that a female juror was seen consorting with Kent Browning, a patron of the hotel bar. Browning allegedly placed his arm around the juror and told her he was a plain clothes deputy providing security for the jury. At the hearing on the motion for a new trial, Browning denied approaching, touching or talking to any of the jurors. He admitted that he did not work for the sheriff's department but that he told Wanda Pillault, a singer at the hotel, that he was there to guard the jury. He also testified that none of his companions spoke to or made any gestures to the jury; that he did not know the Aldens and had no personal knowledge or interest in the case. Both Wanda and Emmett Pillault, entertainers at the hotel, testified that they saw Browning approach a female juror who was peeking into the bar to catch a glimpse of Emmett Pillault's "Elvis routine". However, neither witness was able to testify to any verbal communication that took place between the juror and Browning.
Deputy Carl DeJoie and Deputy Laura Rhodes, who had escorted the jurors, both testified. Deputy DeJoie stated that after he was made aware of the incident by Wanda Pillault, he questioned Browning. Browning admitted to him that he spoke to the juror and put his arm around her but only told her he was a security guard. DeJoie testified that he didn't admonish Browning because he felt "it wasn't that important because he [Browning] didn't say anything about the case to anyone." Deputy Rhodes testified that the jurors were walking to the dining room when the incident took place. She stated that she did not see any juror stop and converse with anyone.
The trial judge's decision on a motion for a new trial rests within his sound discretion; he is accorded considerable latitude in evaluating the evidence and its potential impact on the verdict; and his ruling will not be disturbed on appeal in the absence of a showing of abuse of that discretion. State v. Molinario, 400 So.2d 596 (La. 1981).
Any unauthorized communication made by a non-juror to a juror during trial about the matter pending before the jury is deemed presumptively prejudicial. Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); State v. *1335 Wisham, 371 So.2d 1151 (La. 1979), appeal after remand, 384 So.2d 385 (La.1980); State v. Marchand, 362 So.2d 1090 (La. 1978). However, a new trial is warranted only upon a showing that a constitutional violation occurred and a reasonable possibility of prejudice exists. Durr v. Cook, 589 F.2d 891 (5th Cir.1979).
After a review of the record we find the trial court did not abuse his discretion in denying the motion for a new trial. At best the record indicates Browning made a clumsy attempt at flirtation. No evidence was presented that indicated he was in any way attempting to influence the jury's deliberations.
Louisiana Code of Evidence Article 606(B) provides:
"B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes." (emphasis added).
In the instant case, no showing to this effect was made. No evidence was presented that the case was discussed or that the juror was influenced against the defendant.
These assignments of error are without merit.

ASSIGNMENT OF ERROR 11:
Defendant asserts he has been denied his right to a meaningful appeal because portions of the trial court proceedings were not transcribed and made part of the record, to wit: his objections to the sequestration order and instructions to the jury; his objections to having to work until the "wee hours of the morning" and the trial court's instructing the jurors that they could buy alcoholic drinks at the hotel. In support of his complaint defendant cites Article 1, Section 19 of the Louisiana Constitution and C.Cr.P. Article 843.[6]
The burden of proving that the appellate record is incomplete is upon the defendant. State v. Palrean, 395 So.2d 687 (La. 1981).
In the instant case, defendant fails to provide any evidence that omissions in the trial transcript occurred. Defendant only makes bare allegations with no corroborating evidence.[7]
The record shows that on the second day of trial, defense counsel objected to working late. This objection was noted. No other such objections are found in the record. Even assuming that other objections were made and not recorded, defendant has not stated how his substantive rights were affected. C.Cr.Pro. Article 921.
*1336 Defendant complains that his objections to the trial court's sequestration order and instructions to the jury were not recorded. However, defendant provides no specifics as to how the sequestration order or instructions constituted reversible error.[8]
Finally, defendant asserts the trial court instructed the jurors that they could buy alcoholic drinks at the hotel and that this instruction was omitted from the record. Even assuming arguendo that such an instruction was made, defendant has not established that any of the jurors consumed alcohol and that prejudice resulted. In fact, at the evidentiary hearing on the jury tampering issue, the testimony was clearly to the effect that no jurors entered the bar or consumed alcoholic beverages.
Thus, defendant has not shown that any omissions occurred in the record requiring reversible error.
This assignment of error is without merit.

ASSIGNMENT OF ERROR 12:
Defendant asserts the trial court erred in admitting into evidence prior consistent statements made by Mrs. Alden to her friend Judith Held because the State failed to lay the proper foundation as required by Louisiana Code of Evidence Article 801(D)(1)(b). See also, State v. Marcal, 388 So.2d 656 (La.1980), cert. den. 451 U.S. 977, 101 S.Ct. 2300, 68 L.Ed.2d 834 (1981).[9]
At the trial, defense counsel extensively cross-examined Mrs. Alden as to the conversations she had at the hospital with Judith Held. The defense attempted to diminish Mrs. Alden's credibility by showing that Judith Held convinced Mrs. Alden that defendant had to be the perpetrator because he was the only person in the house who could have shot her. Hence, defendant clearly intended to show that Mrs. Alden's testimony that defendant was the perpetrator was improperly influenced by Judith Held.
The record reflects that Mrs. Held testified during the rebuttal portion of the State's case to the effect that she visited Mrs. Alden at Tulane Medical Center the evening of the murder and that Mrs. Alden kept repeating that as she was getting something out of the safe to show defendant, she was struck on the head. As she turned she saw defendant's face "as if it wasn't Ben's face though." She told Mrs. Held that defendant had a strange look on his face and that he shot her.
Defendant objected to Mrs. Held's testimony as repetitious because Mrs. Alden had already testified to what she told Mrs. Held. The objection was overruled.
A defendant must make known the grounds for his objection. La.C.Cr.P. Art. 841. He is limited on appeal to those grounds articulated at trial and must point to the specific error so that the trial court has the opportunity to make the proper ruling and prevent or cure any possible error. State v. Jackson, 450 So.2d 621 (La.1984); State v. Mitchell, 572 So.2d 800 (La.App. 4th Cir.1990), writ den. 576 So.2d 47 (La.1991).
On appeal defendant articulates a different basis for his objection than articulated at trial. At trial he objected on the grounds that Mrs. Held's testimony was repetitive. On appeal he complains of a lack of a proper foundation as required by La.C.E. Art. 801(D)(1)(b).
As defendant failed to raise the specific objection to lack of a proper foundation as required, we find defendant effectively waived any objection to the testimony on those grounds and cannot now raise it on appeal.
*1337 This assignment of error is without merit.

ORAL ASSIGNMENT OF ERROR
During argument, defendant complains that the court erroneously instructed the jury on reasonable doubt, i.e. a "Cage" charge. However, defendant admits there was no contemporaneous objection. This Court, in State v. Dobson, 578 So.2d 533 (1991) held that, absent a proper objection, arguments on improper jury charges would not be considered.
This assignment is without merit.
For the reasons assigned above, defendant's conviction and sentence is affirmed.
AFFIRMED.
NOTES
[1] Cage v. Louisiana, ___ U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).
[2] La.R.S. 37:2363 contains several exceptions to this privilege, none which are pertinent to the instant case.
[3] See, La.C.E. Articles 608, 609, 609.1 and 610.
[4] Defendant asserts:

First, there must have been some exculpatory evidence in other police reports because the police seized his shoes and the State failed to disclose why the shoes were seized.
Second, defendant surmises that the police found shoe or foot prints at the murder scene and that his shoes were seized in an attempt to match them to the prints. Because the State did not present evidence to this effect, defendant argues this evidence must have been favorable to him.
Third, defendant argues that he was deprived Brady material because if all police reports had been produced he would have learned of a light colored hair found inside his hat. He claims that if he had been allowed to analyze the hair before it was lost, he could have shown that someone else wore the hat and that that person was the person seen by Officer Silbernagel. The hair was lost before it could be analyzed by the F.B.I. crime lab.
Fourth, defendant complains that when he received the full police report after trial, the report referred to large blood stains leading out of the two outside doors. Defendant argues that because there is no evidence the victim exited either of the doors, this supports his claim that someone else committed the murder.
[5] Author's Note (1) to this article in Handbook On Louisiana Evidence Law, Pugh, Force, Rault, and Triche (1990) states:

"(1) The basis for this exception is the spontaneity of the declaration. To qualify under this exception an out-of-court declaration must have been given while the declarant was under the influence of a `startling event or condition' and it must relate to same. The time span between the event or condition and the utterance is thus broader than with declarations fitting under Article 803(1). Matters not `relating' to the startling event or condition are inadmissible under this exception even though the declarant was under the stress of an exciting event or condition at the time he made the declaration."
[6] "Section 19. No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. This right may be intelligently waived. The cost of transcribing the record shall be paid as provided by law."

"Art. 843. Recording of proceedings
In felony cases, and on motion of the court, the state, or the defendant in misdemeanor cases tried in a district, parish, or city court, the clerk of court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders and charges by the court, and objections, questions, statements and arguments of counsel."
[7] Other cases addressing this question contain evidence that actual omissions occurred such as absence of the court reporter, failure of the recording equipment or defects in the transcript. See, State v. Ford, 338 So.2d 107 (La. 1976); State v. Bizette, 334 So.2d 392 (La. 1976), and State v. Rooney, 187 La. 256, 174 So. 348 (La. 1937).
[8] From the context of his argument, it appears that defendant is not complaining about objections to the jury charges because these were recorded but to what the trial court told the jurors what they could or could not do while the trial was in progress.
[9] Comments (b) of 801(D)(1)(b) states this article is not intended to effect any substantial practical change in Louisiana law which has consistently required that a foundation be laid by a party who wishes to use a prior consistent statement for the purpose of rehabilitation. La. R.S. 15:496 referred to in Marcal was repealed by Acts 1988, No. 515, Section 8 and replaced by La.C.E. Art. 801 et seq. eff. January 1, 1989.