PLOTKIN, Judge.
STATEMENT OF THE CASE:
Defendants, Robert Houghton and Ronald Dickens, were indicted by the grand jury. Their trials were severed. They were charged in counts 1, 2, 8, and 9 with aggravated kidnapping, in Counts 3, 4, 10, 11 and 13 with armed robbery, in Counts 5 and 12 with aggravated rape, and in Count 6 with aggravated crime against nature.[1] The defendant pled not guilty to all twelve counts but a twelve-person jury found him guilty as charged on all counts.
On September 16, 1991, the trial court sentenced defendant as follows: on Counts 1 and 2, defendant was sentenced on each count to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence to run concurrently with each other but consecutively to any other sentence; on Counts 3 and 4 defendant was sentenced to ninety-nine years at hard labor without benefit of probation, parole, or suspension of sentence on each count to run concurrently to each other but consecutively to all other sentences; on Count 5, defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence to run consecutively to any other sentence; on Count 6, defendant was sentenced to fifteen years at hard labor without benefit of probation, parole, or suspension of sentence to run consecutively to any other sentence; on Counts 8 and 9, defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on each count to run concurrently to each other but consecutively to any other sentence; on Counts 10 and 11, defendant was sentenced to ninety-nine years at hard labor without benefit of probation, parole, or suspension of sentence on each count to run concurrently with each other but consecutively to any other sentence; on Count 12, defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence to run consecutively to any other sentence; and, on Count 13, defendant was sentenced to ninety-nine years at hard labor without benefit of probation, parole, or suspension of sentence to run consecutively to any other sentence.
FACTS:
In the early hours of October 20, 1990, P.H. and B.H. (due to the nature of the offenses involved, the victims’ names will not be used) went to the Maple Leaf Bar on Oak Street where they met friends. They left the bar after each having had a few beers; and, when they reached B.H.’s car, which was parked on Cambronne Street, P.H. saw that the window on the passenger side had been smashed and B.H. saw that the door on the driver’s side was slightly ajar. Two men then approached them, and one of the men held a gun.
The man with the gun, who was later identified as Ronald Dickens, walked up to P.H., demanded his money, and ordered him and B.H. to get into the car. They complied with B.H. getting into the back seat with Dickens and P.H. sitting in the front passenger seat with the other man, later identified as defendant, Robert Houghton, in the driver’s seat. They drove to the Alerion Bank on Carrollton Avenue where defendant used both P.H.’s and B.H.’s automatic teller machine cards to make withdrawals. A bank security camera videotaped defendant’s actions.
*767 After making the withdrawals, defendant got back into the car and drove around until he reached an apparently abandoned warehouse. Defendant got out of the car, made B.H. get out as well, and told Dickens to shoot P.H. if he made a move. Defendant took B.H. behind the car where he raped her. Defendant then walked to the passenger side, opened the door to let Dickens out, and took the gun from Dickens. Dickens raped B.H. and forced her to perform fellatio on him while defendant walked beside the car, waving the gun and muttering to himself. After-wards, they all got back into the car; and, defendant and Dickens took turns driving the car. Sometime later, defendant and Dickens got out of the car on Canal Boulevard.
P.H. and B.H. then drove to the Second District to report the crime. They both described defendant as shorter, darker, and more muscular than Dickens, who they described as being taller, thinner, lighter skinned, and wearing glasses. A few days later, they met with a police artist who drew a composite drawing of Dickens, but not of defendant. P.H. and B.H. also picked out defendant and Dickens from a photographic lineup; and, P.H. picked them both out from a physical lineup.
In the early morning hours of October 27, 1990, M.M. was dropping off her boyfriend, D.J., at his apartment on Pine Street when two men, both wearing bandannas on their faces, approached them. The taller, thinner, and lighter skinned of the two men held a gun, and he ordered D.J. to get into the back seat. The armed man got into the back seat as well while the shorter, darker, and more muscular man got into the front passenger seat. M.M. was ordered to drive around, and they eventually arrived at a warehouse near the Times-Picayune building. During the drive, the armed man instructed D.J. to keep looking out of the window.
M.M. was ordered to back her car up to the loading dock; and, after she stopped the car, the man in the front seat ordered her out of the car. They went to the rear of the car where he made her give him her panties and told her to remove her tampon, which the police later found. The man then raped M.M. The armed man then exited the car and raped her as well.
They got back into the car and made M.M. drive. The two men spotted a red Toyota, driven by Ivan Lagos, and they ordered M.M. to follow it. When the Toyota stopped at the intersection of Nashville and St. Charles Avenues, M.M. was ordered to hit the Toyota. She hit it slightly; but Lagos did not get out and instead continued driving down Nashville. The two men ordered M.M. to keep following Lagos’ Toyota; and when it stopped at Prytania, she again rammed into its rear.
M.M. exited her car as did Lagos. M.M. began to apologize to Lagos when the shorter man ran up to Lagos, pointed a gun in Lagos’ face, and demanded Lagos’ keys and wallet. Lagos gave them to him, and he and his companion then got into Lagos’ car and drove away. The two men had also taken money from D.J. and M.M.
Lagos identified defendant in a physical lineup as the man who pointed the gun at him. Neither M.M. nor D.J. were able to identify their assailants, but both stated that defendant had the same build as the shorter man.
On the evening of October 27, Anthony Garibaldi, also known as “Mr. G.,” called the police to report that a red Toyota, which he believed to be stolen, was parked in front of his house at 2018 Dante Street. Detective Joseph Lorenzo went to investigate, and he informed Garibaldi that the car had been involved in a rape and armed robbery. While Lorenzo was at the scene, defendant, Dickens, and Shawn LaVigne walked up. Garibaldi told the trio that the car was wanted in a rape and a robbery; and, after a short while, defendant and Dickens left and LaVigne stayed behind. Lorenzo had the car towed away.
After the police left, LaVigne told Garibaldi that he was in trouble because he had been in the car. Garibaldi instructed him to say no more. Garibaldi then spoke with his son Michael who talked to LaVigne and persuaded him to talk to the police. The *768 Garibaldis then accompanied LaVigne to police headquarters.
LaVigne, a friend of both defendant and Dickens, stated that on the evening of October 27, he saw defendant, with another person, in a Mazda. Defendant stopped to ask LaVigne if he had seen Dickens, and LaVigne went with him to a nearby park where defendant went to football practice. After practice was over, Dickens appeared and was driving a red Toyota. LaVigne and defendant got into the Toyota; but, before they left, Dickens told LaVigne to throw away some books, paper, and a water jug that were in the back seat. La-Vigne disposed of them in a garbage can at the park to which he later led the police. Lagos identified the books and papers as having been in the Toyota.
After going to Popeye’s to get chicken for defendant, the trio parked the car at Dante and Spruce Streets and walked to the home of defendant’s girlfriend at 1829-31 Cambronne. While there, defendant asked Dickens if he wanted the gun, a chrome .38 revolver, which LaVigne handled. At approximately 10:30 p.m., they left to go get the red Toyota which was when they saw Lorenzo and Garibaldi.
Arrest and search warrants were issued for defendant and Dickens. Dickens lived at 1839 Cambronne, and he tried to flee when the warrants were executed. The police later executed the search warrant for 1829-31 Cambronne. In a garbage can in the alley next to the house, the police found cassette tapes and papers in Lagos’ name. Lagos identified the items as his. Defendant subsequently turned himself in and denied all involvement in the offenses.
DISCUSSION:
ASSIGNMENT OF ERROR NO. 1:
In this assignment of error, defendant complains that the trial court erred in allowing a defense character witness, Reverend Larry Story, to be impeached with specific instances of misconduct by defendant without a prior Johnson hearing.[2] He argues that the prosecutor’s questioning Reverend Story about defendant’s prior arrests was impermissible and unconscionable and cannot be deemed harmless error.
On direct examination, Reverend Story testified as to defendant’s good character and that the had not known defendant to have ever been in any kind of trouble or to have a criminal record. On cross-examination, the prosecutor asked Reverend Story whether he was aware of or would be surprised if defendant had been stopped in October, 1990 for possession of stolen property. Defense counsel objected on the basis that the question had already been asked and answered and that the Reverend had said that he was not aware of a criminal record. The trial court overruled the objection.
In Johnson, the Louisiana Supreme Court laid down the rule concerning the impeachment of a character witness during cross examination by using other crimes evidence. The Supreme Court requires the trial court to conduct a preliminary inquiry outside the presence of the jury concerning the evidence to be introduced. The purpose of this inquiry is to determine whether 1) the allegation of misconduct sought to be introduced is factually based and accurate; 2) there is a likelihood that the act of misconduct has been talked about in the neighborhood; 3) the act occurred so long ago as to be irrelevant to the question of the defendant’s present character; 4) that the earlier event and allegation concern the specific trait involved in the offense for which the defendant is charged; and 5) the examination will be conducted in proper form. In the instant case, no preliminary inquiry was conducted by the trial court. However, because we feel that the evidence was admissible, the failure to do so was harmless.
The questions asked of Reverend Story were factually based and accurate. The accuracy of the prosecutor’s information concerning defendant’s prior arrests has not been questioned by the defendant. In *769 fact, while testifying, the defendant admitted to the substance of the arrests.
The second inquiry is only relevant to those witnesses who have access to information in the defendant’s neighborhood. In fact, this is exactly what the prosecutor was attempting to prove when he asked Reverend Story about the prior arrests; that Reverend Story had no knowledge of rumors about the defendant or of the defendant’s character. In fact, Reverend Story admitted that the defendant had moved out of his neighborhood some five years prior to this incident. Thus, this inquiry is irrelevant in this case.
In addressing the third inquiry, the prosecutor asked Reverend Story about incidents which occurred in 1990 and 1986. Because the crimes charged in the instant case occurred in 1990 the previous misconduct was not too far removed as to be irrelevant to the present case.
As for the fourth inquiry, the crimes asked about concerned criminal trespass and possession of a stolen vehicle. These crimes, especially the possession of a stolen vehicle, certainly relate to traits involved in the commission of kidnapping, armed robbery and rape.
Finally, although the prosecutor did not couch the questions in the proper form of “have you heard” the essence of the questioning served the purpose for which they were intended, which was to show that Reverend Story had no knowledge of the defendant’s character. The prosecutor’s form of asking the question in the terms of “would you be surprised to know,” while incorrect, was not so egregious as to taint the minds of the jurors.
Therefore, because this court finds that had the trial court conducted a Johnson hearing the questions to Reverend Story concerning his knowledge of defendant’s past arrests would have been deemed admissible, the defendant suffered no prejudice by not having a preliminary inquiry.
ASSIGNMENT OF ERROR NO. 2:
In this assignment of error, defendant complains that, based on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the trial court erred in allowing the State to use the confession of a non-testifying codefendant, Dickens, which implicated defendant in the crimes for which he was being tried. A review of the trial transcript shows that the defendant’s trial counsel objected to the cross-examination about Dickens’ confession on the basis that no foundation had been laid for the introduction of the confession. The trial court sustained the objection and instructed defendant not to answer the question. Under C.Cr.P. art. 841, a defendant must make known the grounds for his objection; and, on appeal, he is limited to those grounds articulated at trial. State v. Baker, 582 So.2d 1320 (La.App. 4th Cir. 1991), writ denied, 590 So.2d 1197 (La.1992).
Without a contemporaneous objection being lodged against the use of statement, the defendant is now asking this court, in effect, to recognize the error as one being patent on the face of record, thus being reviewable under La.C.Cr.P. art. 920. We do not pass on this request because we find the error, even if a patent error, was harmless in the present case. State v. Willie, 559 So.2d 1321 (La.1990). In Willie the Supreme Court stated:
Confrontation errors are subject to the Chapman harmless error analysis. Delaware v. Van Arsdell, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The correct inquiry is whether the reviewing court, assuming that the damaging potential of the cross-examination were fully realized, is nonetheless convinced that the error was harmless beyond a reasonable doubt. Id. at 684, 106 S.Ct. at 1438. Factors to be considered by the reviewing court include “the importance of the witnesses’ testimony in the prosecution’s case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution’s case.” Id. at 684, 106 S.Ct. at 1438.
559 So.2d 1321, 1332 (La.1990).
In the instant case, the State, while questioning the defendant on cross-examination, *770 asked the defendant if he thought Dickens was lying or that the police beat the statement out of Dickens when he said the following:
Me and Robert Charles Houghton was walking down Cambronne and they passed us up and they walked to their car and Robert said “Don’t move” and he held a pistol on them. Then the lady asked him did he bust the glass and Robert said “No.” Then Robert said “Get in the car” and he had a gun on Pat. And then he said. “Let’s go for a ride.”
In analyzing the affect of this statement we look to its importance in light of the other evidence. This statement implicates defendant as being one of the assailants in the crime against P.H. and B.H. However, this is not the only evidence linking defendant to this crime. Both P.H. and B.H. unequivocally identified defendant as their assailant on October 20. The record reflects that B.H. and P.H. separately identified Dickens and defendant in a photographic lineup. Additionally, both identified the defendant as being one of the perpetrators at trial. Clearly, the substance of the statement was already before the jury in the form of the witnesses’ identification of the defendant and was not of great importance to the prosecution’s case as a whole.
This holding is supported by the overwhelming amount of other evidence of defendant’s guilt of the crimes charged. Ivan Lagos positively identified the defendant, during a physical lineup and at trial, as his assailant on October 27, 1990. Additionally, Detective Bruce Harrison testified that papers belonging to Lagos were found in a garbage can outside of the house where appellant lived. Finally, LaVigne testified that he saw defendant and Dickens in the vehicle stolen from Lagos and in fact received a ride in the vehicle. La-Vigne also testified that while at defendant’s girlfriend’s house defendant produced a chrome plated .38 caliber revolver and asked Dickens if he wanted his gun back.
Additionally, when analyzing the extent of the use of the statement, it is clear that the prosecution mentioned Dickens’ statement only to demonstrate that defendant’s contention that Shawn LaVigne was lying was incredulous. In summation, the prosecutor stated “So Ivan (Lagos) made a mistake, B.H. made a mistake, P.H. made a mistake, Shawn has made a mistake, Ronald Dickens has made a mistake, the stuff in your garbage can is just coincidental.” Defendant replied, “Yes. sir.” The statement, rather than being a severely damaging inculpatory statement, was instead used as a cumulative piece of evidence to show that the defendant’s claim that La-Vigne was lying was unbelievable. Therefore, for the preceding reasons, the use of Dickens’ statement, although arguably improper, was harmless beyond a reasonable doubt.
Accordingly, defendant’s conviction and sentence are affirmed.

. In Count -7 of the indictment, Dickens alone was charged with the second degree murder of Christopher Ciaccio. Additionally, the indictment was amended to change the spelling of defendant’s name from Houghton to Houghtion.

. State v. Johnson, 389 So.2d 372 (La.1980), set forth five criteria to be used in determining whether a witness could be cross examined about specific instances of misconduct by the accused.