713 So.2d 588 (1998)
STATE of Louisiana.
v.
Curtis BAILEY.
No. 97-KA-302.
Court of Appeal of Louisiana, Fifth Circuit.
April 28, 1998.
*591 Martin E. Regan, Jr., New Orleans, for Appellant Curtis Bailey.
*592 Paul D. Connick, Jr., District Attorney, Thomas J. Butler, Assistant District Attorney, Research & Appeals, Gretna, for Appellee State.
Before GRISBAUM, BOWES and CANNELLA, JJ.
CANNELLA, Judge.
Defendant, Curtis Bailey, appeals from ten felony convictions, adjudication as an habitual offender and sentences. He was convicted of one count of racketeering and sentenced to fifty years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Also, he was convicted of seven counts of attempted possession of cocaine and sentenced to two and one-half years imprisonment at hard labor on each count. Also, he was convicted of one count of distribution of cocaine and sentenced to thirty years imprisonment at hard labor. Also, he was convicted of one count of attempted distribution of cocaine and sentenced to fifteen years imprisonment at hard labor. All sentences are to run concurrent with each other. For the reasons which follow, we conditionally affirm the convictions, the adjudication as an habitual offender and sentences and remand for an evidentiary hearing.
On December 2, 1992, Marie Jones (Jones) was stopped at the New Orleans International Airport, located in Kenner, Louisiana, by Sergeant Glen Davis (Sgt. Davis). Sergeant T. Miller (Sgt. Miller), employed with the Jefferson Parish Sheriff's Office (JPSO) and assigned to investigate defendant, was called to the airport after Jones was detained. A search warrant was eventually issued for Jones' luggage, and when Sgt. Miller arrived at the narcotics office at the airport, a search of her luggage was underway. Jones was carrying $168,910 in cash. Blocks of cash were wrapped in rubber bands, fabric softener and covered in cellophane paper. She was also carrying several pieces of paper with various names, telephone numbers and addresses written on them, as well as a black address book. The police investigated the names, numbers and addresses found on her and learned that they referred to defendant, Dwayne Rodriguez (Rodriguez), and Daniel Swann (Swann).[1] The address book contained phone numbers for Rodriguez and his girlfriend. Jones was not arrested and was allowed to go.
Thereafter, with the information obtained from the Jones search, records for Store All storage unit # 1188 at 6827 Lapalco Boulevard, Harvey, Louisiana, were subpoenaed. Although the unit was rented to Una Taylor (Taylor), she testified that defendant asked her to rent it for him. Cameras were placed in the hallways near the particular storage unit rented to Taylor. The police also obtained a subpoena for the Stor All system records, which reflected every time the unit was accessed. On December 14, 1992, pursuant to a search warrant that Sgt. Miller had obtained, the Stor All unit was searched. Three suitcases were found in this unit, one of which contained seven packages of cocaine wrapped in cellophane.
Thereafter, Sgt. Miller obtained several other search warrants for various addresses associated with defendant. The search warrants were executed simultaneously on December 14, 1992. Defendant was arrested pursuant to a warrant executed while the search of 3620 Delaware Street was underway. The arresting officer testified that he read defendant his rights when he arrested him.
Jones was arrested in January of 1994. In February of 1994, Pete Labyzon (Labyzon) was also arrested. Pursuant to plea agreements, both Jones and Labyzon agreed to cooperate with authorities. Jones met with police officers on numerous occasions, providing them with information on various hotels and telephone numbers allegedly involved in the charged offenses.
Once Jones identified particular hotels where she had stayed, the hotel records, receipts and telephone records were subpoenaed. *593 Such records corroborated much of what she told the police.
On April 21, 1994, a grand jury for Jefferson Parish indicted defendant on one count of racketeering, in violation of La. R.S. 15:1351, et seq., and nine counts of distribution of cocaine and/or possession of cocaine with the intent to distribute, in violation of La. R.S. 40:967(A). On May 25, 1994, defendant was arraigned and he pled not guilty to all counts.
A motion for preliminary hearing was denied by the trial court on January 25, 1995. On the same date, the trial judge took up the motions to suppress evidence as to several homes and the Stor All storage unit, a motion to suppress the evidence taken from Jones at the airport and a motion to suppress the information gathered with the pen register. All of the motions were denied on January 26, 1995. On January 27, 1995, the trial court denied the defense's motion for a severance of the defendants.
On January 31, 1995, the Supreme Court denied review of the writ applications. State v. Olivares, 95-0278 (La.1/31/95), 649 So.2d 395. On January 31, 1995, the defendants' trial began and continued until February 13, 1995, when the defense moved for a mistrial as to all defendants. The mistrial was granted as to defendants, Swann, Rodriguez, Kemp and Olivaries on February 14, 1995.
On April 17, 1995, the state moved to sever defendant from the others, and jury selection began in defendant's second trial. Trial continued until April 21, 1995, when the state announced that one of its witnesses, Neumba Davison, was going to be arrested for perjury. The District Attorney explained that Ms. Davison had an "outstanding attachment." The trial judge refused to set bond.
Trial continued until the afternoon of April 27, 1995, when the twelve person jury returned guilty verdicts to one count of racketeering, seven counts of attempted possession of cocaine, one count of distribution of cocaine, and one count of attempted distribution of cocaine. The jury was polled, and the trial judge announced that the verdict was unanimous.
At trial, the following testimony and facts were presented. Jones testified for the state against defendant. She stated that Rodriguez initially approached her and requested that she fly to Louisiana. She made nine trips to Louisiana, arriving with cocaine and leaving with money. These nine trips formed counts two through ten of the indictment.
She testified that during the middle of October of 1992, she began transporting cocaine to New Orleans and she continued to do so until December 2, 1992. She specifically remembers December 2, 1992, because that was the day that she was carrying approximately $170,000 in cash and she was stopped in the New Orleans International Airport. She stated that during each of her trips to New Orleans, she transported approximately ten, thirteen or twenty kilograms of cocaine per trip. On her return trips, she transported blocks of cash back to Rodriguez in California. She explained that she worked for Rodriguez, who was the organizer in California, and explained that Swann, Kemp, Lowe and Olivaries were also involved with Rodriguez. She testified that the purchaser of the cocaine was defendant.
Jones testified that Swann and Lowe were responsible for exchanging the suitcases of cocaine for the suitcases of money once she had arrived in New Orleans. She explained that she had picked up the cocaine from Kemp's home in California. Kemp was also responsible for being available for telephone calls. She again testified that defendant was the buyer of the cocaine. She explained that she first got involved because Rodriguez approached her in California and asked her to work with him, transporting cocaine by airplane.
Thereafter, Jones described the nine trips that she made to Louisiana. Specifically, she testified that on her first trip, she knew cocaine was in the suitcase because she had broken the suitcase's lock and looked inside. Lowe and Swann came to her hotel room to retrieve the suitcase of cocaine and told her to "hurry up because Curtis [Bailey] was waiting." They left her hotel room, returning within approximately an hour with another suitcase. The men called Rodriguez, *594 who instructed them to open the suitcase and check to see that all the money was there. The men opened the suitcase in front of Jones and she saw that it contained blocks of money. Thereafter, Jones flew back to California with the suitcase of money and she took it to Rodriguez.
Jones stated that prior to her fourth trip, Olivaries dropped off a box of ten kilograms of cocaine to her at her home in California. She wrapped up the cocaine, put it in her suitcase and again flew to New Orleans. When Lowe and Swann came to her hotel room to pick up the suitcase of cocaine, they again were in a hurry, telling her that defendant was waiting. The two men left her hotel room, only to return within approximately an hour to give her another suitcase. Jones testified that two large blocks of money were in the suitcase that Swann and Lowe brought to her. She flew home to California, and Rodriguez picked up the money from her at her home.
Jones testified that before she made her fifth trip to New Orleans, Rodriguez directed her to pick up the cocaine from Kemp's house. She picked up the ten blocks of cocaine, wrapped them and put them into her suitcase. Swann and Lowe were supposed to come to her hotel room to pick up the suitcase, but they never called her. Rodriguez gave Jones a phone number and instructed her to call defendant. She called the phone number and asked Marie Bailey to put defendant on the phone. Thereafter, Jones spoke to defendant, telling him that she could not find Swann or Lowe. He told her that he would try to find them. Approximately an hour later, Swann and Lowe arrived at her hotel room, whereupon Jones gave them the suitcase of cocaine. The two men returned within the hour, giving Jones another suitcase, which she testified contained two and a half blocks of money.
Jones made her sixth trip to New Orleans with a suitcase of cocaine. She testified that Swann was not in New Orleans on this trip, but that Lowe and defendant came to her hotel room. When Lowe took the suitcase of cocaine, he handed her another suitcase. Thereafter, Lowe left and Jones and defendant remained in her hotel room, talking about defendant's Rolex watch. The defendant left her hotel room, but returned a couple of hours later with a bottle of Dom Perignon champagne. However, Jones' flight the next morning was early and she did not feel like having a drink, so defendant left her hotel room. Jones flew back to California with the money, which she gave to Rodriguez. She testified that she told Rodriguez that defendant had made an advance on her and advised Rodriguez that he needed to talk to "home boy."
Jones testified that on one of her later trips, she went to defendant's house. Once, Olivaries dropped off ten kilograms of cocaine and Jones again flew to New Orleans with it packed in a suitcase. Upon her arrival at her hotel, she called Rodriguez, who advised her that she had to meet with defendant. She called defendant at his home and he gave her the address where he wanted to meet. Jones could not remember if the address was Delaware Street, but she remembered that she had written the address on a piece of paper from the Ramada hotel. The district attorney showed her State Exhibit number 42, which she identified as the piece of paper on which she had written the address. The exhibit reflected the address 3620 Delaware Street, apartment B, as well as a phone number associated with defendant.
Jones testified that after speaking with defendant, she took a cab to the address that he had given her. Upon reaching the house, Jones and Lowe knocked on the door. Defendant opened the door and let them inside. Jones had the suitcase of cocaine with her when she went into defendant's house. Defendant was wrapping the money in blocks and Jones helped him finish. Thereafter, the two switched suitcases. Jones took the suitcase of money and defendant took the suitcase of cocaine. Jones flew back to California with the suitcase of money, which she gave to Rodriguez.
Jones testified that during her last trip, she transported ten kilograms of cocaine to New Orleans. Upon arriving at her hotel, she called Rodriguez, who gave her a phone number and advised her to call it. She called the number and defendant answered the *595 phone. Defendant gave her an address where they would meet each other. Jones took a cab to the address, which she remembered was on Dimarco Street. Upon arriving at the address, defendant let her inside with the suitcase of cocaine. Again, she helped defendant wrap the money in blocks. She testified that while she was in the house, she saw money on a table and cocaine in a bag that was sitting on the floor. When she left the house, she left the suitcase of cocaine with defendant and took a suitcase of money with her. After she arrived at the airport, purchased her plane ticket to California and sat down to eat some breakfast, a narcotics detective sat down next to her.
Jones testified that the detective approached her and said that he was not accusing her of having any drugs, but asked her if she'd mind if he looked in her bags. She remembered Rodriguez's advice and told the officer that he had to get a search warrant first. She explained that a warrant was obtained and her bags were searched. The money that she had gotten from defendant was seized, as were various pieces of paper.
Pete Labyzon (Labyzon) testified that sometime in September or October of 1992, he spoke with Rodriguez and Swann on the phone, because they had called his house requesting to speak with his brother. When Labyzon told them that his brother was not there, the men asked him whether he knew defendant. He testified that he told the two men that although he didn't know defendant, he could get in touch with him because he knew Marie Bailey, defendant's sister. A few days later, defendant's sister picked up Labyzon in her car and the two met with Lowe and Swann at the Piccadilly Cafeteria on Carrollton Avenue. Labyzon testified that, while the group was eating lunch, defendant arrived at the restaurant. According to Labyzon, defendant and Swann left the restaurant, returning approximately twenty to thirty minutes later.
Labyzon also testified that approximately a week or so after this first meeting, Lowe and Swann again called him, informing him that they were back in New Orleans and requesting that he drive them around the city. Labyzon picked up Rodriguez, Lowe and Swann. Labyzon said that the men told him that they were "down here to meet with Curtis." However, Labyzon also testified that he had never delivered any drugs to defendant, seen anyone else deliver any drugs to defendant or heard defendant talking about drugs.
Defendant testified on his own behalf. Although he admitted that he had asked Taylor to rent the Stor All unit on Lapalco Boulevard for him, he denied that he had ever placed any drugs in the storage unit. He further denied any knowledge that any drugs were stored in the unit. He claimed that a man named Coleman was actually using the storage unit during December of 1992. He admitted to having lunch with Labyzon, Lowe, Swann and his sister at the Piccadilly on Carrollton Avenue. This was the first time that he met Lowe and Swann. He explained that he and Swann left the Piccadilly to get a daiquiri. He denied that he had seen any cocaine nor had anything to do with any cocaine during the time periods alleged in the indictment. He denied that he had ever met Jones and that he had never received any cocaine from her. He claimed that Jones had lied to the police.
During cross-examination, he admitted his previous conviction for possession of cocaine. He again denied that he had ever made any arrangements with Swann regarding cocaine. He denied knowing Rodriguez and stated that he had never called Rodriguez. He admitted that he had called Dimitri Swann, because he had dated her. He admitted that he knew Kemp and that he had called Kemp's house, but explained that he had called to speak to Dimitri Swann, because she was living there. He claimed that Officer Miller was lying regarding the statement that he allegedly gave, wherein he denied knowing any of the people whose names were listed on the indictment.
Following the jury verdict, the district attorney filed an habitual offender bill on May 25, 1995. Defendant filed motions for a new trial and to continue sentencing, claiming that the Stor All unit was searched by the JPSO prior to securing a search warrant. Defendant requested that the trial court continue the sentencing date until Friday, June *596 2, 1995 so that he would have time to develop the evidence concerning the motion for new trial. The trial court denied both motions on May 30, 1995. On May 31, 1995, the trial court sentenced defendant to fifty years at hard labor on the racketeering charge, two and one-half years at hard labor for each of the seven counts of attempted possession of cocaine, thirty years at hard labor on the one count of distribution of cocaine and fifteen years at hard labor on the one count of attempted distribution of cocaine. The trial court stated that all sentences were to run concurrently and that defendant was to receive credit for time served. Following sentencing, defendant pled not guilty to the habitual bill filed by the Jefferson Parish District Attorney's Office on May 25, 1995.
An habitual offender hearing was conducted on January 25, 1996. On February 29, 1996, the trial court adjudicated defendant a second felony offender, vacated the original sentence on the racketeering charge. Thereafter, the trial court re-sentenced the defendant on that charge to fifty years imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. On March 5, 1996 defendant filed a motion for appeal.
On appeal, defendant assigns fourteen errors.

ASSIGNMENT OF ERROR NUMBER ONE
In this assignment of error, defendant argues that the trial court erred in denying his motion to suppress the evidence seized from the airport stop, search and seizure of Jones' luggage.[2] He contends that Sgt. Davis lacked reasonable suspicion to initially stop Jones at the New Orleans airport because it was based on uncorroborated information he received from a "concerned citizen," and, therefore, that all evidence subsequently seized from Jones pursuant to the search warrant was tainted by the "illegality" of the initial stop.
The state argues that the information received from an anonymous concerned citizen created a reasonable suspicion pursuant to La.C.Cr.P. art. 215.1, and thus justified Sgt. Davis' investigatory stop of Jones at the airport. Therefore, the trial court's denial of the suppression motion was correct.
The United States Constitution and the Louisiana Constitution prohibit unreasonable searches and seizures. U.S. Const. Amend. 4; La. Const. of 1974, art. 1, § 5. La.C.Cr.P. art. 215.1 provides in pertinent part:
A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
Although the purpose of the stop is limited and the duration is brief, an investigatory stop constitutes a "seizure." State v. Moreno, 619 So.2d 62, 65 (La.1993). In Moreno, the supreme court set forth the general principles pertinent to analyzing investigatory stops as follows:
... A person is seized under the Fourth Amendment when a reasonable person would think that he was not free to leave... An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity, or there must be reasonable grounds to believe that the person is wanted for past criminal conduct. Based on the totality of the circumstancesthe whole picturethe detaining officers must have particularized and objective basis for suspecting the particular person stopped of criminal activity. (Citations omitted).
Id.
In the instant case, we find that there was reasonable suspicion for Sgt. Davis' stop of Jones. First, Jones had purchased a oneway ticket to a source city for drugs with cash. Second, the name reflected on Jones' *597 flight ticket did not match the name reflected on her California identification. Third, as the consensual encounter progressed, Jones appeared nervous, her hands were trembling and her breathing became labored. Fourth, when asked whether she had her airplane ticket with her, she initially withdrew a ticket from her purse, but hurriedly put it back in her purse and reached into her coat pocket for a second ticket, which she handed to the officer. Finally, Jones had given the officer three different stories regarding why she was in New Orleans. At that point, Sgt. Davis asked if he could search Jones' purse and carry-on bag. She stated that she wouldn't necessarily mind but that she would prefer for him to get a warrant for any searches of her baggage. He informed her that he would get the warrant and that she could catch her flight but that her purse, carry-on bag and checked bag would be detained in New Orleans. She stated that she would remain with her baggage and thereupon followed Sgt. Davis to the narcotics office. She made several telephone calls to California, identifying herself as Rose Jones, although she told the officer that she was calling family. She appeared to be very nervous. The canine dog Jerry was brought to the office and alerted on all of Jones' bags. After securing the search warrant, Jones' bags were searched. No drugs were discovered in any of the bags. $170,000 in cash was discovered in one of the bags, along with an address book and some papers with names and phone numbers.
Based on the foregoing, we find, as did the trial court, that Sgt. Davis had reasonable suspicion justifying the stop of Jones and the ensuing detention while a search warrant for her bags was obtained. Accordingly, we find this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant claims that the trial court erred in denying his motion to suppress evidence that was seized as a result of an allegedly illegal search and seizure. Specifically, defendant claims that the search warrants for the following locations were not based upon probable cause: 6827 Lapalco Boulevard, unit # 1188; 3620 Delaware Street, Apartment # B, Kenner; Jefferson Guaranty Bank, 4951 Lapalco Boulevard, Box 280; 622 Governor Hall Street, Gretna; and 2224 Snowbird Drive, Harvey. Defendant argues that Sgt. Miller based his applications on stale, unreliable and uncorroborated information.
The state argues that the information contained in the search warrants was not too attenuated from the date on which the search warrant applications were made. The information came from a continuing investigation that commenced in June of 1992 but went through December 9, 1992, just days before the search warrant applications were made.
A search warrant may issue only upon an affidavit establishing probable cause to the satisfaction of a neutral magistrate. La. Const. art. 1, Sec. 5 (1974); La.C.Cr.P. art. 162; State v. Duncan, 420 So.2d 1105, 1107 (La.1982). Probable cause exists "when the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient to support a reasonable belief that evidence or contraband may be found at the place to be searched." State v. Johnson, 408 So.2d 1280, 1283 (La.1982).
In 1983, the United States Supreme Court adopted a "totality of the circumstances" analysis for determining whether an informant's tip established probable cause for issuance of a search warrant. The Supreme Court stated:
[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. (Emphasis added).
Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The Louisiana Supreme Court followed the Gates approach *598 in State v. Byrd, 568 So.2d 554, 559 (La.1990).
Furthermore, a magistrate's determination of probable cause, prior to the issuance of a search warrant, is entitled to significant deference by the reviewing court. Further, marginal cases should be resolved in favor of finding a magistrate's assessment to be reasonable. State v. Rodrigue, 437 So.2d 830, 833 (La.1983). In evaluating a stale information challenge to a magistrate's finding of probable cause, the issue is whether the passage of time attenuated the facts supporting the probable cause finding to a degree that defeats the inference that the objects sought in the warrant may still be found on the premises. Factors important to making this determination are the object's nature, whether the object can be expected to be retained on the premises because of its nature and whether the evidence shows a continuing course of conduct. State v. Ogden, 391 So.2d 434, 437 (La.1980); State v. Bailey, 94-76, pp. 4-5 (La.App. 5th Cir. 6/28/94), 639 So.2d 860, 864.
In the present case, Sgt. Miller, the officer who prepared all five of the search warrant applications, testified at the suppression hearing. On cross-examination, he testified that when he presented the magistrate his supporting affidavits, he did not provide any information beyond what was found in the four corners of each warrant application.
On cross-examination, Sgt. Miller testified that the warrant for 6827 Lapalco Boulevard, unit # 1188 was prepared on December 13, 1992 and was executed on December 14, 1992. On December 14, 1992, he prepared the warrants for the following four addresses: 4951 Lapalco Boulevard, 2224 Snowbird Drive, 3620 Delaware Street; and 622 Governor Hall Street. These warrants were executed later that day.
Sgt. Miller also testified that all five supporting affidavits were identical, with the exception of a single paragraph that was not included in the affidavit for 6827 Lapalco Boulevard, Stor All unit # 1188. The paragraph conveyed the results of the search made the previous day at the Stor All unit on Lapalco Boulevard. Specifically, the paragraph explained that at 8 a.m. on December 14, a search was made of the Stor All unit #1188 and that seven kilograms of white powder was found pursuant to this search. Sgt. Miller placed an "X" by this paragraph in each of the affidavits. (State Exhibits S-2-C through S-5-C). Thereafter, defendant's attorney asked the officer to select any one of the identical affidavits for use during the remainder of cross-examination.
Sgt. Miller testified that the affidavit for 2224 Snowbird Drive reflected that during the first week of November of 1992, at least one, possibly more, phone calls were made from defendant's cellular telephone to this particular address. However, Sgt. Miller was unable to recite a particular date upon which a single telephone call was purportedly made, or to say how many telephone calls were made. Sgt. Miller admitted that the affidavit did not provide specific dates, nor did it reflect how many calls were allegedly made from defendant's cellular telephone to this particular address. He also admitted that the magistrate would, therefore, have known neither the dates nor the number of calls that were allegedly made from defendant's cellular telephone to this address.
Sgt. Miller testified that the affidavit reflected that some time during June of 1992, a confidential informant had provided the police with information regarding the 2224 Snowbird Drive address. The officer thereafter admitted that although the affidavit reflected that he had consistently seen defendant at 2224 Snowbird Drive, said affidavit did not provide any dates upon which such observations were allegedly made. He further admitted that, therefore, the magistrate would not have known from looking at the affidavit what dates the police allegedly saw defendant at this particular address.
Sgt. Miller also testified with respect to the affidavit in support of the search warrant issued for 3620 Delaware Street. He testified that the warrant stated that telephone records received by the police on December 9, 1992 reflected that on October 24, 1992, two telephone calls were placed from 3620 Delaware Street to (714) 543-6006. Sgt. Miller placed an "X" next to this paragraph. *599 (State Exhibit S-4-C, p. 15). The warrant reflected that this same phone number was written on one of the pieces of paper seized from Jones when she was stopped at the airport on December 2, 1992. Sgt. Miller thereafter explained that, when considering the paragraphs together, Jones was stopped on December 2, 1992, just twelve days before the warrant was issued on December 14, 1992. Sgt. Miller admitted that the warrant did not reflect either the person who had made/received said telephone calls, nor the content of said telephone calls.
Sgt. Miller pointed out that the affidavit in support of the warrant application for 3620 Delaware Street reflected that during driveby surveillance conducted by the police, defendant's car was observed parked at said address. However, he admitted that because the affidavit did not provide any dates or times for such sightings, the magistrate would not have known when the sightings allegedly occurred. Sgt. Miller also placed an "X" next to the paragraph in the affidavit identifying Gidget White, who lived at 3620 Delaware Street on December 9, 1992, as a girlfriend of defendant. (State Exhibit S-4-C, pp. 6-7). Sgt. Miller again admitted that the warrant provided neither specific dates nor a general time frame during which defendant stayed at this address.
Sgt. Miller also testified as to the contents of the affidavit in support of the search warrant for 622 Governor Hall Street. When asked by the defense attorney where the affidavit provided probable cause for the search of this particular address, he directed the defense attorney to the full paragraph in the middle of page 13. He testified that this paragraph of the affidavit reflected that on December 8, 1992, the police learned that the Stor All unit on Lapalco Boulevard was leased by Taylor, who lived at 622 Governor Hall Street. Sgt. Miller also pointed to the last paragraph on page 13 as another example of information contained in the affidavit which supported the officer's belief that the evidence found in the storage unit was connected to 622 Governor Hall Street. (State Exhibit S-5-C).
When cross-examined about the affidavit in support of the search warrant for 6827 Lapalco Boulevard, unit # 1188, Sgt. Miller testified that the first piece of information supporting the "freshness of information regarding the storage unit" was that on December 2, 1992, Jones was stopped at the airport. (State Exhibit S-1-C). He also pointed out that the affidavit reflected that on December 2, 1992, the Stor All unit was accessed approximately forty-five minutes before Jones checked out of her hotel room.
In fact, the affidavit reflects that on December 2, 1992, Jones checked out of her hotel at 6:29 a.m. and that the Stor All unit was accessed at 7:14 a.m. (State Exhibit S-1-C, pp. 10, 14). Sgt. Miller admitted that the affidavit did not reflect who had accessed the Stor All unit. However, Sgt. Miller further testified that he personally believed that the entirety of the affidavit pertains to the search of the Stor All unit.
Sgt. Miller also pointed to pages 5 and 6 of the affidavit, particularly to the information that he received from a confidential informant. While admitting that this paragraph of the affidavit provided no specific dates, he explained that the purpose of this paragraph was to generally explain what defendant did with the cocaine after he received it. The officer also admitted that although the affidavit stated that defendant was the father of Taylor's child, it did not reflect the age of the child.
Sgt. Miller testified that he received information from four confidential informants (hereinafter C1, C2, C3 and C4). The officer admitted that he did not know if C1 had ever been convicted of perjury. Also, he knew that C1 had a prior criminal history involving an arrest for a drug violation, but the affidavit did not reflect this fact. Sgt. Miller admitted that he did not know whether C1 had any pending charges against him that might have been reduced or dropped in exchange for the information which he supplied in the present case. He also admitted that the affidavit did not indicate the date that C1 allegedly saw defendant dealing large quantities of drugs.
However, Sgt. Miller explained that all information provided by C1 was corroborated through other intelligence and information.
*600 He pointed out that the affidavit reflected that C1 had provided him with information during the month preceding the warrant applications. He admitted that C1 had not provided him with information pertaining to any other case. Sgt. Miller stated that C1 was never a target in the present case, nor was C1 ever given any sort of immunity for the information that he provided to the police. He testified that, after another police officer notified him that C1 had some information that might pertain to the present case, he spoke with C1 two or three times.
Sgt. Miller admitted that C2 also had a criminal history, that at least one of the convictions involved drugs and that the affidavit failed to reflect this. He testified that he had arrested C2 before for a traffic and weapons violation, but that he could not remember the date. He admitted that this was not included in the affidavit. Sgt. Miller also admitted that, on one occasion, a deal was worked out with C2, but that he did not know the details.
Sgt. Miller admitted that C2 did have pending charges against him, that he did not know the details of such charges and that the affidavit did not reflect this. He pointed out that the affidavit reflected that he had received information that led to arrests from C2 approximately three years prior to the present case, but thereafter testified that he was unsure whether any of the arrests led to convictions.
Sgt. Miller admitted further that, although the affidavit reflected that on August 11, 1992, C2 told him that defendant occasionally resided at 2224 Snowbird Drive, the affidavit did not provide alleged dates for such occurrences. The officer did state that the affidavit reflected that C2 had told him that he had purchased cocaine from defendant at least ten times during the past six months. Sgt. Miller testified that he corroborated the information he received from C2 through independent investigation and that such information had never proven to be false. He also testified that C2 was never a target during his investigation of the present case.
Although Sgt. Miller admitted that he had never compared the statements of C1 with those of C2, he explained that he had not noted any inconsistency that would have caused him to do so. He acknowledged that the affidavit stated that C1 told him that defendant distributed five to ten kilograms per month and that C2 told him that defendant distributed twelve to fifteen kilograms per week. He did not consider these to be conflicting statements.
Sgt. Miller admitted that while the affidavit stated that C3 provided information to Drug Enforcement Agency (DEA) Agent Randy Goodson (Agt. Goodson), he could swear that this was what Agt. Goodson told him, but not whether the information provided by C3 was good or bad, since he had never spoken to C3. He did not know whether C3 had any prior arrests or convictions. In fact, he stated that he did not even know C3. He did not know whether C3 had any pending charges against him. He admitted that the affidavit did not reflect how long C3 had provided information to any law enforcement department.
Sgt. Miller also admitted that the same applied to the information provided by C4. He could swear that the affidavit contained what Federal Bureau of Investigation (FBI) Agent Rick Hill (Agent Hill) relayed to him, but not whether the information provided by C4 was good or bad. He also admitted that although the affidavit reflected that he spoke with Agents Hill and Goodson on October 15, 1992, the affidavit did not reflect when C3 and C4 relayed said information to the agents. In fact, Sgt. Miller never spoke to C4, nor did he know whether C4 had provided information to any other law enforcement agency. He did not know whether C4 had any pending charges against him.
On redirect examination, Sgt. Miller testified that he began receiving the information contained in the affidavits in June of 1992 and that the receipt of information continued until the time when the warrants were typed. He stated that he was able to corroborate all of the information that he received from the four confidential informants.
Thereafter, the trial court denied the motion to suppress, stating as follows:
"I don't think it's even close enough to be a matter of great deference, counsel. I've *601 been a magistrate in this Court for 15 years. If these warrants are no good, then none of them are any good. The motion is denied."
Considering all of the circumstances and the compelling facts, which Sgt. Miller both included in the affidavits and testified to during the suppression hearing, it is clear that the trial court had a substantial basis for concluding that probable cause existed with respect to the five search warrants. Defendant's complaint that the information contained in the warrants was stale, uncorroborated and unreliable is without merit. The record from the suppression hearing is replete with examples of Sgt. Miller's testimony wherein he stated that all information that he received from the four confidential informants was corroborated through independent investigation. Sgt. Miller testified that the information contained in the affidavit was collected between June of 1992 and December 14, 1992 and that such collection was ongoing. For example, the record reflects that the affidavit stated that on December 9, 1992, the police received defendant's cellular telephone records from the telephone company. Such records indicated that on October 25, 1992, two calls were placed to (714) 536-7006. The affidavit reflected that this is the same number that was written on one of the pieces of paper that was seized from Jones during her stop in the New Orleans International airport on December 2, 1992. Thus, the trial court appropriately denied defendant's motion to suppress.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant argues that the trial court committed error by refusing to suppress the pen register for a telephone number allegedly used by defendant in connection with the criminal offenses alleged against him. Defendant contends that the state's pen register applications were defective because they did not articulate facts sufficient to show reasonable suspicion of criminal activity as required by La. R.S. 15:1314, the statute governing pen register applications.
The state contends, to the contrary, that the pen register applications met the statutory requirements. The state also notes, however, that the pen register statute provides no penalty for failing to comply with its requirements.
La. R.S. 15:1314(B)(2) requires that a pen register application include "[a] certification by the applicant attesting that the information sought is relevant to an ongoing felony criminal investigation being conducted by that agency, and includes in that certification a recital of facts or information constituting the reasonable suspicion upon which the application is based."
In this case, a hearing was held on defendant's motion to suppress evidence obtained pursuant to the pen register. Sgt. Miller testified that in connection with its criminal investigation of this case, the JPSO submitted a pen register application to the district court on November 3, 1992, which was signed on the same date. The application included the following statement
... that it is believed that the subject of the investigation [Curtis Bailey] is using telephone number XXX-XXX-XXXX listed in the name of Curtis Bailey and located at 1909 Betty Street, Marrero, La. in furtherance of the subject offenses; and that the information likely to be obtained from the pen register is relevant to the ongoing criminal investigation in that: information has been received from two reliable informants that Curtis Bailey is presently dealing in kilogram quantities of cocaine.
Therefore, it is clear that this application, stating that the information was received from two reliable informants, is sufficient to establish "reasonable suspicion," as required by La. R.S. 15:1314(B)(2).
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Defendant complains that the trial court erred in denying his motion to quash because his convictions on the racketeering charge and on the nine overt acts, as listed in the indictment, violated the constitutional guarantee against double jeopardy. Specifically, defendant argues that the state relied *602 on the proof of the overt drug charges to prove the racketeering charge against him.
There are no state court cases on point, regarding whether convictions under La. R.S. 15:1351, et seq, (The Louisiana Racketeering Act) and the predicate offenses, in this case La. R.S. 40:967(A), constitute double jeopardy. However, in State v. Smith, 95-0061 (La.7/2/96), 676 So.2d 1068, 1069-1070, reh'g denied, 95-0061 (La.9/11/96), 679 So.2d 380, the Supreme Court explained the protection against double jeopardy as follows:
Both the United States and the Louisiana Constitutions protect individuals against the peril of twice being put in jeopardy for the same offense. In pertinent part, the Fifth Amendment of the U.S. Constitution provides "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Similar language is contained in the Louisiana Constitution. See La. Art. 1 § 15.
Protection against double jeopardy is divided into three fundamental guarantees, namely: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and, (3) protection against multiple punishment for the same offense. State v. Mayeux, 498 So.2d 701 (La.1986). North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).
Louisiana courts have applied two distinct tests to determine whether offenses are the same for double jeopardy purposes. In Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the U.S. Supreme Court set out a precise rule of law to determine if a double jeopardy violation has transpired. The Blockburger test is as follows:
"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions the test to be applied to determine whether there are two different offenses or only one, is whether each provision requires proof of an additional fact which the other does not."
See State v. Coody, 448 So.2d 100 (La. 1984); State v. Vaughn, 431 So.2d 763 (La.1983); State v. Knowles, 392 So.2d 651 (La.1980); and State v. Doughty, 379 So.2d 1088 (La.1980).
The other standard employed by our courts is the "same evidence" test. This test tell us:
"If the evidence required to support a finding of guilt of one crime would also have supported a conviction for the other, the two are the same under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for a conviction, not all of the evidence introduced at trial."
See Coody, supra at 102; Vaughn, supra at 766; and State v. Steele, 387 So.2d 1175 (La.1980). Also see State v. Miller, 571 So.2d 603 (La.1990).
Additionally, with instances involving multiple punishment, legislative intent must be examined. Even when offenses are the same because each crime does not require proof of a fact that the other does not or because the evidence required to sustain a conviction for one offense may also sustain a conviction for the other, a clear expression of the legislature may overcome the presumption against multiple punishment and sanction cumulative penalties in a single proceeding. In Missouri v. Hunter, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the court stated "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." In each instance, legislative intent must be ascertained. If the legislature has failed to reveal its intention, courts should proceed cautiously and remain sensitive to the interests of both the defendant and society. All relevant evidence must be considered and common sense will often be the most useful technique. See State v. Smith, 475 So.2d 331 (La.1985).
Further, in denying the rehearing, Chief Justice Calogero, concurring in the denial, further explained:

*603 In the single trial context, the Double Jeopardy Clause serves only to constrain the sentencing court to punishing according to legislative intent. Id.[, 459 U.S.] at 366, 103 S.Ct. at 678. In the words of the Hunter Court:
[S]imply because two criminal statutes may be construed to proscribe the same conduct under the Blockburger test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes. The rule of statutory construction noted in Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) is not a constitutional rule requiring courts to negate clearly expressed legislative intent.... Legislatures, not courts, prescribe the scope of punishments.
Hunter, 459 U.S. at 368, 103 S.Ct. at 679.
There is no question that, just as with felony murder and the particular underlying felony in a given case, the crimes of second degree feticide and manslaughter are the "same": conviction for second degree feticide, based on the killing of the fetus during the manslaughter of the mother, cannot be had without proving all of the elements of the underlying felony of manslaughter, just as, for example, a felonymurder conviction for killing during a rape cannot be had without proving all the elements of the rape. See Whalen, 445 U.S. at 694, 100 S.Ct. at 1439. When two offenses are the "same" under either the Blockburger test or the "same evidence" test, separate prosecution of each is jeopardy barred. That is the very heart of double jeopardy protection. However, if both offenses are prosecuted in a single trial, the two tests serve only as a first step in the jeopardy inquiry, by raising a rebuttable presumption against cumulative punishment. The second step, fashioned in Whalen, is determining whether a "clear indication of contrary legislative intent [to cumulatively punish]" exists to rebut that presumption. Id. at 691-92, 100 S.Ct. at 1437-38; see Jones v. Thomas, 491 U.S. 376, 381, 109 S.Ct. 2522, 2526, 105 L.Ed.2d 322 (1989). As indicated in this Court's opinion on original hearing, such a contrary intent was evident here. The Louisiana legislature clearly intended to punish the non-consensual, involuntary termination of a pregnancy, whether done intentionally, unintentionally, or negligently, in addition to any other criminal penalties which may be assessed with respect to harm done the mother, and not to combine those separate and distinct interests into a single offense punishable by a sentence which, as in this case, may be less than the punishment provided for the crime against the mother alone. Accordingly, the defendant's conviction of and cumulated sentences for both second degree feticide and the manslaughter of the mother, properly accomplished in a single proceeding, were not jeopardy barred.
As in Smith, defendant herein was prosecuted for both offenses in the same trial. Thus we must look to the Legislative intent regarding multiplying defendant's punishment under these circumstances. Clearly, in enacting the Racketeering Act, the Legislature expressed its clear intent to increase the punishment for the individual crimes when a pattern of criminal or racketeering activity is also proven.
Moreover, in looking to our federal counter part we note that the federal courts have consistently held that prosecuting and sentencing of a defendant for both Racketeer Influenced and Corrupt Organization (RICO), 18:1961 et seq. violations and the predicate offenses does not violate double jeopardy. United States v. Padgett, 78 F.3d 580 (4th Cir.1996); United States v. O'Connor, 953 F.2d 338 (7th Cir.), cert. denied, 504 U.S. 924, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992); United States v. Evans, 951 F.2d 729 (6th Cir.1991), cert. denied, 504 U.S. 920, 112 S.Ct. 1966, 118 L.Ed.2d 567 (1992); United States v. Arnoldt, 947 F.2d 1120 (4th Cir. 1991), cert. denied, 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992); United States v. Erwin, 793 F.2d 656 (5th Cir.), cert. denied, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986).
Many of the federal cases holding that the prosecution and sentencing of a defendant to both RICO conspiracy and the predicate offenses *604 does not violate double jeopardy supported their decisions on the holding in Garrett v. United States, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). In Garrett, the court considered whether the Double Jeopardy Clause barred prosecution for a continuing criminal enterprise (CCE) offense after an earlier prosecution for one of the predicate offenses. In that case, the United States Supreme Court held that prosecution for CCE after the prosecution for one of the predicate offenses was constitutional.
Based on the foregoing, we find that, as here, where all the offenses were prosecuted in a single trial, double jeopardy does not bar conviction with additional sentences on both the Racketeering offense and the predicate offenses.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER FIVE.
Defendant complains that the state used its peremptory challenges to systematically exclude black prospective jurors from his jury. More specifically, the defense objects to the exclusion of two jurors, Almena Trufant (Trufant) and Bettie Williams (Williams), which they argue were excluded in violation of Batson, solely because of their race.
Equal protection guarantees that criminal defendants have the right to be tried by a jury selected by nondiscriminatory criteria. U.S. Const. Amend. 14; Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It is well established that the use of peremptory challenges based solely on race is prohibited. Id. On a Batson claim that the prosecutor has used peremptory challenges in a manner violative of the Equal Protection Clause, a defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of a juror's cognizable racial background.
If a prima facie case is established, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834, reh'g denied, 515 U.S. 1170, 115 S.Ct. 2635, 132 L.Ed.2d 874 (1995); Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); Batson v. Kentucky, 476 U.S. at 96-98, 106 S.Ct. at 1722-1724; State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272. The Batson criteria are codified in La.C.Cr.P. art. 795.
This court has held that a trial court's rulings regarding discriminatory jury selection are entitled to great deference and will not be overturned absent a finding of manifest error. State v. Durham, 94-1036 (La. App. 5th Cir. 4/16/96), 673 So.2d 1103.
Defendant here objects to the state's use of peremptory challenges to excuse African-Americans Trufant and Williams, arguing that the state did not give a sufficiently race-neutral explanation for so doing.
The state excused prospective jurors Trufant and Williams, along with two other jurors. The state explained, as its reason for the exclusions, that it deemed the next prospective juror, Vincent Panepinto (Panepinto), to be a desirable prostate juror. Therefore, aware that the defense had exhausted their challenges, the state was excusing those jurors in order to get Panepinto as the last juror. The trial court ruled that the state's reasons were sufficiently race-neutral and denied the defense objection to the state challenges.
On appeal, this court must determine whether the trial court erred in finding that defendant did not meet his burden of proving purposeful discrimination by the state in excluding the two jurors in question. The proper question for our consideration is "whether the defendant's proof, when weighed against the prosecutor's proffered `race-neutral' reasons, is strong enough to persuade the trier-of-fact that such discriminatory intent is present." State v. Green, 655 So.2d at 290.
As previously noted, there is no showing herein that the prosecutor was excusing jurors based upon racially discriminatory reasons. Rather, it is evident that the prosecutor *605 was making a strategic decision with regard to these two jurors. The state viewed Panepinto as a more desirable juror and within reach by use of the challenges on the other prospective jurors. We note that four jurors were challenged at the time, not just the two that the defense is concerned with here. The state's decision was one of trial strategy and not racial discrimination. Therefore, we do not find that the trial court erred in finding that defendant did not carry his burden of proving that the state embarked upon purposeful discrimination.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX
Defendant argues that the trial court erred in refusing to allow the defense to challenge juror Panepinto for cause. The defense contends that Panepinto indicated he was acquainted with Lieutenant Kevin Smith (Lt. Smith), a potential witness for the state, and that the existence of this relationship would cause Panepinto to give greater weight to Lt. Smith's testimony.
The state counters the defense argument by pointing out that Panepinto never stated that he would be influenced by any relationship he had with Lt. Smith. Further, the relationship, if any, was from years earlier, as Lt. Smith was a childhood friend of Panepinto's thirty-eight year old son. Panepinto, had no contact with Lt. Smith recently, except to see him at two social functions over the past few years. More importantly, Lt. Smith's testimony was not on a main issue in the case, but only on a peripheral matter of transportation of evidence.
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Alberto, 95-540 (La.App. 5th Cir. 11/28/95), 665 So.2d 614, writs denied, 95-1677 (La.3/22/96), 669 So.2d 1222, 96-0041 (La.3/29/96), 670 So.2d 1237. A trial court has wide discretion in determining whether sufficient cause has been shown to reject a prospective juror and such determination will not be disturbed on appeal unless it is shown that the judge abused his or her discretion. State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, rehearing denied, cert. denied, ___ U.S. ___, 117 S.Ct. 310, 136 L.Ed.2d 227, rehearing denied, ___ U.S. ___, 117 S.Ct. 600, 136 L.Ed.2d 527 (1996). A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion where, on further inquiry or instruction, the juror has demonstrated the willingness and the ability to decide the case impartially, according to the law and evidence. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683.
The defense contends that the trial court erred in not dismissing Panepinto for cause because of his relationship with a state witness which would cause him to give greater weight to that witnesses testimony than to the defense witnesses. However, we find that the record does not support the defense argument.
When questioned about his acquaintance with Lt. Smith, Panepinto stated that Lt. Smith and his then thirty-eight year old son had been childhood friends. Panepinto indicated that it had been a long time since he had had any close contact with Lt. Smith, only seeing him twice in the past few years at social gatherings. Panepinto stated that if he was on the jury, he was going to listen to everybody and base his opinion on all of the testimony. More importantly, Lt. Smith was not an eye-witness whose testimony would call into question his credibility. Lt. Smith was only going to testify concerning handwriting samples he took from a co-defendant and transported to the handwriting expert. Therefore, we find that defendant has failed to show that the trial court erred in denying his challenge for cause as to Panepinto, because there is no support for the argument that Panepinto would be unable to render judgment according to law.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
By this assignment of error defendant argues that he was prejudiced by the state's actions in arresting its own witness, Neumba Davidson (Davidson), after she testified contrary to what the police officers *606 testified she had previously stated. Defendant contends that the state's action in this regard had a chilling effect on the testimony of the other defense witnesses.
The state argues that perjury is a punishable criminal offense. Therefore, upholding and enforcing the law cannot be a violation of defendant's rights.
While the defense argues that Davidson's perjury arrest was not supported by her trial testimony, the defense does not specify in what way defendant was prejudiced by this arrest. The arrest of the witness was not made in the presence of the jury, so the jury was not tainted in any way. The arrest occurred after the witness testified, so the state was not using the perjury arrest as a means of influencing the witness' testimony. And, while defendant argues that the arrest had a chilling effect on the other defense witnesses, defendant does not specify which, if any, of the sequestered witnesses knew of the arrest or how it affected them.
We find no merit in this assignment of error.

ASSIGNMENT OF ERROR NUMBER EIGHT
By this assignment of error defendant complains that the trial court erred in curtailing his cross-examination of the key state witness, Jones. More specifically, the defense argues that the trial court erred in refusing to allow defense counsel to fully question Jones concerning her prior convictions, her probation revocation and by requiring the defense to show her a letter which she wrote before questioning her and possibly exposing inconsistent statements.
Concerning the first two arguments, that the trial court erred in limiting defense questioning concerning the witness' prior convictions and probation revocation, the state argues that the trial court rulings were correct under La. C.E. art. 609.1.
La. C.E. art. 609.1, addressing the attack on the credibility of a witness by using evidence of prior criminal convictions, provides in pertinent part:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
C. Details of conviction. Ordinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible. However, details of the offense may become admissible to show the true nature of the offense:
(1) When the witness has denied the conviction or denied recollection thereof;
(2) When the witness has testified to exculpatory facts or circumstances surrounding the conviction; or
(3) When the probative value thereof outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury. (Emphasis added).
In the instant case, the defense attempted to question the witness concerning the specific facts or details of her prior conviction. The state objected. The trial court found that the witness admitted committing the crime and that she did not testify to exculpatory facts surrounding the conviction. Thus, under La. C.E. art. 609.1, the trial court ruled that the defense could cross-examine Jones with respect to the fact of a conviction, the name of the offense, the date of said conviction and the sentence imposed, but noted that the defense could not get into the "specific acts" surrounding the crimes. Similarly, with regard to defense questioning about Jones' probation revocation, the trial court ruled that the defense could ask the witness whether she had worked with the police before to avoid the revocation of her probation. But the trial court limited defense questions concerning the number of times that the witness was called in for probation revocation proceedings.
The trial court is vested with much discretion in controlling the scope and extent of cross-examination and its rulings will not be disturbed absent a finding of abuse of that discretion. State v. Brooks, 94-1031 (La. App. 5th Cir. 5/30/95) 656 So.2d 772. On the facts presented in this case, we find no such abuse of discretion in the minor limitations placed on the defense's cross-examination of Jones. The trial court rulings were in accord with La. C.E. art. 609.1.
*607 Under this same assignment of error, defendant also argues that the trial court erred in refusing to allow defense counsel to question Jones concerning her expressed intent to claim for herself the money seized at the airport, without first showing her a letter which she wrote evidencing that sentiment on her part. In other words, the defense intended to ask her the questions and, following a denial by the witness, expose her lack of credibility by introducing the letter she wrote expressing a contrary view. After asking Jones if she expected to get one half of the money back for herself and having her deny that, defense counsel attempted to go further by asking her if she ever wrote to anyone telling them that she expected to get one half of the money for herself. At this point, the witness was prevented from answering the question by state objection. An in chambers conference followed in which the trial court ultimately ruled that the defense had to show the witness the letter before he could ask her any questions about it. It is this ruling which defendant argues on appeal was error. The state argues that the ruling was not erroneous, but if it was, it was harmless error.
Defense counsel argued that he should have been permitted to ask the witness the question concerning whether she had ever written to anyone stating that she intended to get one-half of the money back for herself. Then, after she answered the question, if she denied the question, defense counsel could have shown her the letter and used it to impeach her. La. C.E. art. 613. The contrary ruling by the trial court was error. However, under the facts presented herein, we find the error harmless. While the defense was not permitted to ask the witness if she ever wrote to anyone and expressed the view that she intended to get one half of the money for herself, the defense did ask the witness whether at any time she expect to get one half of the money for herself. She stated that she did not. The defense did introduce the letter and cross examined the witness extensively on it pointing up the inconsistencies. Therefore, we find any error in the trial court ruling on this point to be harmless.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER NINE
Defendant contends that the trial court erred in not declaring a mistrial after a state witness allegedly gave hearsay testimony concerning remarks by a co-conspirator.[3] The defense contends that the conspiracy ended with defendant's arrest in December of 1992. Thus, the remarks made by the co-conspirator in January of 1993 were not admissible as statements by a co-conspirator.
The state argues that under State v. Lobato, 603 So.2d 739 (La.1992), once the state established the conspiracy, the burden shifted to the defense to prove the conspiracy had terminated before the statement was made. In this case, although the defendant was arrested in December of 1992, he was released on January 4, 1993. The statement was made on January 7, 1993 and defendant was not re-incarcerated until January 12, 1993. Thus the state argues that because the statements were made while the defendant was out of prison, the defense did not meet its burden of proving that the conspiracy was terminated at the time the remarks were made.
The question of the admissibility of co-conspirator statements was addressed by the Louisiana Supreme Court in the case of State v. Lobato, 603 So.2d 739 (La.1992). Therein the court stated:
After the state presents a prima facie case of conspiracy, the burden of proof shifts to the defendant to present evidence showing his withdrawal from the conspiracy prior to the time the statements were made by his co-conspirators. The conspiracy is presumed to continue unless or until the defendant shows his withdrawal from or the termination of the conspiracy. United States v. Walker, 796 F.2d 43, 49 (4th Cir.1986). To prove withdrawal, a defendant must show affirmative actions made by him which are inconsistent with the object of the conspiracy. United *608 States v. United States Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Such affirmative actions include making a clean breast through confession to the authorities as well as notification to the co-conspirators of abandonment or withdrawal. United States v. Patel, 879 F.2d 292, 294 (7th Cir.1989), cert. denied, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990).
The standard for determining the admissibility of statements made by co-conspirators is less than that required to convict a defendant of conspiracy to commit an offense. Such statements, if admissible, only constitute evidence which the jury may consider in reaching its conclusion as to whether a defendant did or did not unlawfully participate in a conspiracy to commit an offense beyond a reasonable doubt. Accordingly, a trial court's determination as to the admissibility of such evidence, i.e., whether the state has made a prima facie showing of a conspiracy and whether a defendant has sufficiently proven withdrawal so as to make his co-conspirators' statements admissible or inadmissible under LSA-C.E. Art. 801(D)(3)(b), will not be overturned absent clear error. See United States v. Taylor, 802 F.2d 1108 (9th Cir. 1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987).
* * * * * *
A defendant's arrest does not necessarily terminate his involvement in a conspiracy, United States v. Ammar, 714 F.2d 238, 253 (3rd Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983) and cooperation with authorities may or may not be sufficient to show withdrawal. In United States v. Patel, 879 F.2d 292 (7th Cir.1989), cert. denied, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990), the Seventh Circuit concluded the defendant failed to show his cooperation with authorities constituted withdrawal from the conspiracy. The court, citing United States v. Borelli, 336 F.2d 376, 388 (2nd Cir.1964), stated that:
... for withdrawal to limit a conspirator's liability and ... his exposure to statements by co-conspirators, "mere cessation of activity is not enough ...; there must also be affirmative action, either the making of a clean breast to the authorities, or communication of the abandonment in a manner calculated to reach co-conspirators and the burden of withdrawal lies on the defendant."
In this case, we find that the state established the conspiracy, shifting the burden to defendant to prove his withdrawal from the conspiracy before the statements in question were made. No such proof is of record. The only evidence admitted to establish the termination of the conspiracy was defendant's arrest prior to the statements. Arrest alone is not enough. Further, in this case, defendant had been released before the statements were made. Thus, we find that there was no error in the admission of the statements into evidence.
Moreover, out of an abundance of caution, the trial court went ahead and admonished the jury not to consider the statements of the co-conspirator as relayed by the witness. Thus, we find that any error in the admission of the statements was cured by the trial court's admonition. Defendant's argument that the admission of this statement required a mistrial has no merit.

ASSIGNMENT OF ERROR NUMBER TEN
Defendant contends that his right to a fair and impartial jury was violated by the unauthorized communication made by Panepinto's wife to him, which he in turn repeated to the other jurors. More specifically, during trial and before deliberations the wife of Panepinto told her husband that a woman had telephoned the Panepinto home asking for the phone number of their daughter and identifying herself as a Ms. Bailey (same name as defendant's). Panepinto's wife refused to give the woman caller their daughter's number but asked for a telephone number where her daughter could reach the caller. As it turns out, the caller gave a pay telephone number. She told this story to her husband who in turn told it to the other jurors before deliberations and verdict. Upon finding out this information, after *609 verdict, defense counsel moved for a mistrial.[4] The trial court denied the motion.
The state argues that a mistrial is only required when there is a showing that defendant could not receive a fair trial and no such showing was made here. A defendant's constitutional right to a fair trial by an impartial jury may be violated where jurors are subjected to influences which cause them to base their verdict on factors other than the evidence admitted at trial. Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); State v. Bibb, 626 So.2d 913, 922 (La.App. 5th Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188. Any unauthorized communication made by a nonjuror to a juror (directly or indirectly) during trial about the matter pending before the jury is deemed presumptively prejudicial. State v. Marchand, 362 So.2d 1090 (La.1978); State v. Bibb, supra; State v. Baker, 582 So.2d 1320 (La.App. 4th Cir.1991), writ denied 590 So.2d 1197 (La.), cert. denied, 506 U.S. 818, 113 S.Ct. 62, 121 L.Ed.2d 30 (1992). However, a new trial is warranted only upon a showing that a constitutional violation occurred and a reasonable possibility of prejudice exists. State v. Day, 414 So.2d 349 (La.1982); State v. Bibb, supra; State v. Baker, supra.
We cannot make this determination based on the appellate record before us. The record does indicate that Panepinto was told a story by his wife concerning a person with the same name as defendant's, looking for his daughter. It is also clear that Panepinto relayed this story to the other jurors prior to deliberations. What is not clear is whether this information affected the impartiality of the jury in deciding whether defendant was guilty of the charges against him and/or whether any effect the information may have had on the jury was harmless. This issue can only be established through an evidentiary hearing. Therefore, we must remand for an evidentiary hearing concerning this issue. Following the hearing, the trial court should make a determination as to whether defendant is entitled to a new trial. State v. Bibb, 626 So.2d 913, 922 (La.App. 5th Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188. We reserve to defendant the right to appeal any adverse ruling following the hearing. State v. Hamilton, 92-2639 (La.7/1/97), 699 So.2d 29; State v. Wille, 559 So.2d 1321 (La.1990); State v. Bibb, supra.; State v. Brown, 558 So.2d 1226 (La.App. 1st Cir. 1990).
This assignment of error has merit and requires remand for an evidentiary hearing as specified above.

ASSIGNMENT OF ERROR NUMBER ELEVEN
Defendant argues that the trial court erred in denying his motion to continue sentencing so that he could have time to investigate facts that had just come to his attention to support his motion for new trial.
The state counters that the facts defense counsel wanted to investigate, specifically, the tapes to the Stor All unit, were available to him throughout the trial and was not new evidence that had only recently come to his attention.
La.C.Cr.P. art. 853 provides in pertinent part:
A motion for a new trial must be filed and disposed of before sentence. The court, on motion of the defendant and for good cause shown, may postpone the imposition of sentence for a specified period in order to give the defendant additional time to prepare and file a motion for a new trial.
In State v. Bourque, 622 So.2d 198, 224 (La.1993), speaking on the standard of review of a trial court's denial of a motion for continuance, the Louisiana Supreme Court stated as follows:
"The granting or refusal of a motion for a continuance rests within the sound discretion of the trial judge." State v. Simpson, 403 So.2d 1214, 1216 (La.1981). This ruling will not be disturbed absent a clear abuse of discretion. State v. Washington, 407 So.2d 1138, 1148 (La.1981); Simpson, 403 So.2d at 1216. Whether a *610 refusal is justified depends on the circumstances of the case. In general, this court has declined to reverse a conviction based on the denial of a motion for continuance absent a showing of specific prejudice. Id.
Applying these precepts to the instant case, we find no showing that the trial court abused his discretion in the denial of defense counsel's request for a continuance. Defense counsel stated that he had only two days earlier discovered evidence that led him to believe that the state had searched the Stor All unit prior to obtaining a warrant. The defense wanted the sentencing continued for three days to allow him to review video tapes of the entry to the Stor All units. However, the state countered with argument that defendant had previously been aware of the witness in question and his whereabouts, and the defense had years within which they could have viewed the video tapes to the Stor All units. Thus, the trial court determined that the defense had not shown good cause for the continuance. We find no abuse of discretion in that ruling.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER TWELVE
By this assignment of error defendant contends that the state did not provide sufficient evidence to prove that he was the same person who was convicted of the predicate felony alleged in the habitual offender bill of information. Defendant further argues that the state failed to prove that he knowingly and voluntarily waived his rights when pleading guilty to the predicate offense alleged by the state.
The state disagrees, arguing that there was adequate proof in the record to establish that this defendant had a prior felony conviction and was properly adjudicated a second offender.
To prove that a defendant is an habitual offender, the state must establish, by competent evidence, the prior felony convictions and that defendant is the same person who was convicted of the prior felonies. State v. Chaney, 423 So.2d 1092 (La.1982); State v. Franklin, 94-409 (La.App. 5th Cir. 12/14/94), 648 So.2d 962, writ denied, 95-0143 (La.5/19/95), 654 So.2d 1354; State v. Metoyer, 612 So.2d 755 (La.App. 5th Cir.1992). The state may establish this by various means, such as the testimony of witnesses to prior crimes, expert testimony matching fingerprints of the accused with those in the record of prior proceedings, or photographs contained in a duly authenticated record. State v. Brown, 514 So.2d 99 (La.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216, reh'g denied, 487 U.S. 1228, 108 S.Ct. 2888, 101 L.Ed.2d 923 (1988). The state must further show that the predicate convictions fall within the ten-year cleansing period prescribed by La. R.S. 15:529.1(C). Additionally, where the prior conviction is based on a guilty plea, if defendant denies the allegations of the bill of information, the state has the burden of proving the existence of the prior guilty pleas and that defendant was represented by counsel. Once the state meets this burden, defendant must produce some affirmative evidence of an infringement of his rights or of a procedural irregularity. Thereafter, the state must prove the constitutionality of the plea. State v. Shelton, 621 So.2d at 769 (La.1993).
In this case, the state charged defendant as a second felony offender. The predicate conviction alleged was in district court case number 89-4731, a charge of possession of cocaine. At a hearing on January 25, 1996, the state offered the testimony of Patricia Adams (Adams), an expert in fingerprint analysis with the JPSO. Adams took a set of fingerprints from defendant in court prior to the habitual offender hearing. (State's Exhibit One). She compared them with State's Exhibit Two, a set of fingerprints from the Louisiana State Police Bureau of Criminal Identification, and testified that the two sets of fingerprints were from the same person. The state also introduced an arrest register (State's Exhibit Three) purporting to pertain to the predicate offense, the bill of information and other documents pertaining to the predicate offense (State's Exhibit Four), and the guilty plea transcript from the prior offense (State's Exhibit Five). After the state put on its evidence, the trial court took the matter under advisement.
*611 Defendant contends the second set of fingerprints (State's Exhibit Two) was not sufficient evidence to link him to the predicate conviction, since they did not come from the bill of information or from a Department of Corrections document. Defendant's argument has some weight.
State's Exhibit Two is linked to the bill of information in case number 89-4731 by defendant's name, the date of the offense, and the offense charged. However, State's Exhibit Two does not contain the police item number, which number is contained on the bill of information. See State v. Simmons, 95-309 (La.App. 5th Cir. 10/18/95), 663 So.2d 790. Thus, the documentary evidence provides only tenuous linkage between defendant and the predicate offense. This evidence was, however, bolstered by other evidence.
On February 29, 1996, the trial court allowed the state to put on the testimony of Assistant District Attorney John Molaison (Molaison). Molaison testified that he was the Assistant District Attorney assigned to defendant's prior cocaine case, and that he was present when defendant pled guilty to that offense. After hearing Molaison's testimony, the trial court found defendant to be a second felony offender. The testimony, coupled with the fingerprint evidence, was sufficient to prove defendant's identity with the previous offense. See State v. Martin, 28,489 (La.App. 2nd Cir. 8/21/96), 679 So.2d 557, writ denied, 96-2367 (La.2/7/97), 688 So.2d 498.
Defendant objected to Molaison's testimony and raises the issue here. Defendant complains that the trial court erred in allowing the state to "reopen" the hearing to put on this additional testimony.
The record does not indicate that the trial court "reopened" the hearing. The trial court did not issue a ruling at the close of the hearing, rather, it took the matter under advisement or held it open for further consideration. Further, because of the nature of habitual offender proceedings, there is no double jeopardy problem created by the trial court's procedure. Defendant does not offer any support for his assertion that the trial court erred in permitting this testimony, nor do we find any.
Defendant contends the state did not adequately prove that defendant was advised of his Boykin rights before entering the guilty plea to the predicate offense. Therefore, the trial court erred in considering it and adjudicating defendant a second felony offender.
In its brief to this court, the state concedes this point, noting that the transcript produced by it does not show that the trial court apprized defendant of his rights to trial by jury, confrontation and his privilege against self-incrimination. Therefore, the state argues that because the state presented less than a "perfect" transcript, under State v. Shelton, supra, the trial judge hearing the habitual offender bill is required to weigh the evidence and determine whether the state met its burden of showing the predicate guilty plea was valid.
The state argues that the trial court was correct in finding that the defendant made a knowing and voluntarily plea. The Boykin transcript shows that defendant's counsel explained defendant's rights to him. Defendant told the trial judge that he understood his rights as they were explained to him, and that he understood the consequences of his guilty plea. The waiver of rights form in State's Exhibit Four contains an explanation of the Boykin rights. Defendant signed his initials next to each of these rights, indicating he understood them and chose to waive them. Furthermore, in State v. Pittman, 585 So.2d 591 (La.App. 5th Cir.), writ denied, 586 So.2d 545 (La.1991), and State v. Boney, 535 So.2d 1328 (La.App. 5th Cir.1988), this court declined to set aside a guilty plea where the trial court had failed to verbally apprize defendant of his Boykin rights.
Accordingly, we find that the record supports the trial court's adjudication of this defendant as a second felony offender.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THIRTEEN
Defendant argues that his sentence of fifty years imprisonment at hard labor without benefit of parole, probation or suspension *612 of sentence on the racketeering offense is constitutionally excessive.
The state points out that defendant was charged with and convicted of ten different offenses. Therefore, this type of ongoing criminal activity demands a serious sentence.
A sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. State v. Lassere, 95-1009 (La.App. 5th Cir. 10/1/96), 683 So.2d 812, writ denied, 96-2655 (La.4/18/97), 692 So.2d 445. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Id. The sentence imposed will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within statutory limits. Id.
In the present case, defendant was initially sentenced on the racketeering offense, to the maximum sentence of fifty years imprisonment at hard labor. Thereafter, he was charged as an habitual offender and, following a hearing, adjudicated a second felony offender. The trial court vacated the original sentence on the racketeering conviction and, under La. R.S. 15:529.1(A)(1)(a), resentenced defendant as an habitual offender to fifty years at hard labor without benefit of parole, probation or suspension of sentence. Under that statute, as a second felony offender, defendant was exposed to a sentencing range of twenty years minimum to one hundred years maximum. La. R.S. 15:1354(A) & La. R.S. 15:529.1(A) (1)(a). Thus, defendant's sentence to fifty years was less than one half of his sentencing exposure. Considering the ongoing nature of defendant's criminal activity, as well as the fact that his prior conviction was also for a drug offense, we do not find that this sentence is constitutionally excessive.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER FOURTEEN
By this assignment of error defendant argues that the evidence was insufficient to support his convictions in several respects. More specifically, defendant presents the following complaints:
1). The state failed to present any evidence that the appellant met with Dwayne Rodriguez in September of 1992 in Jefferson Parish;
2). The State failed to present any evidence that the appellant met with Swann or Brennan in October of 1992 in Jefferson Parish to discuss cocaine trafficking to and from California;
3). The State of Louisiana failed to present any evidence that the appellant placed the suitcase of cocaine in the Stor All unit, alternatively, the appellant contends it was a reasonable hypothesis of innocence that Donald "Duck" Coleman, who had a key to the Stor All unit, placed the cocaine in the storage unit;
4). It is constitutionally insignificant that coconspirators remarked to Marie Jones that "Curtis was waiting" to establish the elements of an attempted and/or distribution conviction; and
5). Marie Jones, as a matter of law, was an incredible witness.
In response, the state points out that the record, taken as a whole, provides sufficient evidence to constitutionally support the convictions for the crimes with which defendant was charged. Defendant's complaints herein relate to specific facts but do not present an argument that there is insufficient evidence to support the convictions for the charged offenses. We agree.
Defendant was found guilty of the following offenses: one count of racketeering, in violation of La. R.S. 15:1352; seven counts of attempted possession of cocaine occurring on specific dates, in violation of La. R.S. 14:27 and 40:967; one count of distribution of cocaine occurring on a specific date, in violation of La. R.S. 40:967; and one count of attempted distribution of cocaine occurring on a specific date, in violation of La. R.S. 14:27 and 40:967.
The appropriate standard of review for determining the sufficiency of the evidence was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In Jackson, the Supreme Court explained *613 that when assessing the sufficiency of the evidence, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. See also State v. Rosiere, 488 So.2d 965 (La.1986).
With regard to defendant's first four complaints, we note that they do not relate to any specific crimes with which defendant was charged. Rather, they relate to certain facts. While these facts may have helped to establish or prove the racketeering charge, they were by no means the only evidence used to support the conviction of that crime and even absent proof of each of the facts as alleged in defendant's brief, there was still sufficient record evidence to establish defendant's guilt for the charged offenses.
In other words, defendant was not indicted for or convicted of the actions for which defendant complains in brief that there was insufficient evidence to prove. These factors were merely pieces of an overwhelming amount of evidence supporting defendant's convictions.
Defendant's fifth complaint concerns the testimony given by Jones, complaining that Jones was an "incredible witness." However, it is not the function of this court to assess the credibility of witnesses or to reweigh the evidence. State v. Rosiere, 488 So.2d 965 (La.1986); State v. Sampson, 95-58 (La.App. 5th Cir. 5/30/95), 656 So.2d 1085.
Based on the foregoing, we find that this assignment of error lack merit.

ERROR PATENT REVIEW
The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir. 1990); and State v. Godejohn, 425 So.2d 750 (La.1983). No such errors were found.
Accordingly, for the reasons stated above, the defendant's convictions for one count of racketeering, seven counts of attempted possession of cocaine, one count of distribution of cocaine and one count of attempted distribution of cocaine and his respective sentences, after being adjudicated a second offender, to fifty years in prison at hard labor without benefit of parole, probation or suspension of sentence, two and one-half hears at hard labor for each of the seven counts, thirty years at hard labor and fifteen years at hard labor, to run concurrently, are conditionally affirmed, and the case is remanded for the trial court to conduct an evidentiary hearing on defendant's claim that the jury verdict was tainted by unauthorized communications to the jurors, reserving to the trial court the authority to grant a new trial if deemed necessary and reserving to defendant the right to appeal any adverse ruling following the hearing.
CONVICTIONS, ADJUDICATION AS AN HABITUAL OFFENDER AND SENTENCES CONDITIONALLY AFFIRMED; CASE REMANDED.
NOTES
[1] Defendant was indicted along with five co-defendants: Dwayne Rodriguez (Rodriguez), Daniel Swann (Swann) and Brennan Lowe (Lowe), who have also appealed to this court (97-KA-204, 97-KA-181 and 97-KA-501), and Dennis Kemp (Kemp) and Alfonse Olivaries (Olivaries), who have not appealed.
[2] Under Louisiana Constitution Article 1, Sec. 5, any person adversely affected by a search or seizure allegedly conducted in violation of Article I, Sec. 5, has standing to raise that illegality. Our Supreme Court addressed that provision in State v. Culotta, 343 So.2d 977 (La.1976). For application of this constitutional provision in a racketeering case such as this one, see State v. Hamilton, 572 So.2d 269, 276 (La.App. 1st Cir. 1990), writ denied, 578 So.2d 929 (La.1991). See also La.C.Cr.P. art. 703(A).
[3] The witness, a DEA agent, testified that the co-conspirator Rodriguez told him that he had lost $100,000 in an airport bust in New Orleans involving a fat woman named Marie.
[4] While defendant here moved for a mistrial, since the jury had already returned its verdict, the proper procedural vehicle by which to raise this issue should have been by motion for new trial. We will consider the motion as such.